[L. A. No. 2571. Department One.—January 9, 1911.]

HENRY S. McKEE, Assignee in Insolvency of the Wentworth Hotel Company, Respondent, v. TITLE INSURANCE AND TRUST COMPANY et al., Appellants; OAK KNOLL COMPANY, Respondent.

CORPORATIONS—SUBSCRIPTION TO STOCK—BONDS ISSUED AS PART OF SUBSCRIPTION—STOCK ISSUED AS FULLY PAID UP.—A subscription agreement for the purchase of stock in a corporation which expressly states that a certain amount of the bonds of the corporation and an additional percentage of its stock were to be delivered as "an additional consideration for this subscription," implies a purchase of the bonds, as well as of the particular shares of stock formally "subscribed," and all in consideration of the sums agreed to be paid. The bonds received in pursuance of such contract are obtained by way of bargain and sale and not as a gift, and if the aggregate value of the bonds and stock so issued did not exceed the consideration paid, the bonds became the legal obligation of the corporation. This result follows, notwithstanding the fact that in carrying out the agreement a scheme was resorted to so as to make it show on the books of the corporation that the consideration paid was for the stock, so that it might appear thereon as fully paid up.

ID.—INSOLVENCY OF CORPORATION—VALIDITY OF BONDS—FRAUD ON CREDITORS.—Where the assets of the corporation are sufficient in value to pay its existing debts, the fact alone that it is unable to pay its debts as they become due does not make the sale of its bonds fraudulent as to its creditors nor raise a presumption of fraudulent intent. To make such a transfer conclusively fraudulent, under section 3442 of the Civil Code, it must be made voluntarily, or without a valuable consideration.

ID.—RIGHT OF CORPORATION TO SELL BONDS—INADEQUACY OF PRICE—FRAUD IN SALE OF STOCK.—The corporation had the lawful right, the same as any natural person, to sell its bonds for any price it could get, provided it acted in good faith, and mere inadequacy of price did not avoid them. Any fraud, if there were such, in the sale of its stock, could not be transferred to the bonds and made available as a foundation for their cancellation. It is available only upon an inquiry concerning the liability of the stockholders for calls as for unpaid subscriptions.

ID.—CORPORATION MAY DISCOUNT BONDS.—There is no rule of public policy or law of this state which forbids a corporation which is a going concern, from discounting its notes or bonds. The provision of article XII, section 11 of the constitution, and of section 359 of the Civil Code, that no corporation shall issue stock or bonds "except,

for money paid, labor done, or property actually received," and that any "fictitious increase" of stock or indebtedness is void, does not forbid the sale of bonds at a discount.

Id.—Appeal from Judgment—Review of Findings—Erroneous Opinion of Trial Court.—On appeal from a judgment upon the question whether or not the judgment is sustained by the findings, all the facts are presented for the consideration of the appellate court. The appellate court is not bound by the opinion of the trial court as to the effect or application of certain facts found, or as to the law relating thereto, nor by the method of reasoning by which that court reached its conclusion. If, upon considering all the facts and the law as the appellate court understands it, that court is satisfied that the final conclusion of the trial court was right, the judgment will be upheld, and the erroneous reasoning of the trial court will be disregarded.

Id.—Creation and Increase of Bonded Indebtedness—Foreign Corporation—Failure to Observe Legal Requirements—Validity of Issue—Estoppel.—Conceding that the conditions imposed by section 359 of the Civil Code, upon the creation or increase of the bonded indebtedness of a corporation, are applicable against foreign corporations issuing bonds in connection with business done by them in this state, the failure to observe the requirements of the section does not make an original bond issue void at the option of creditors, or of one acting in their interest, where they were issued for a valuable consideration and without fraud. The corporation and its creditors are estopped to dispute the validity of the bonds so issued. That section, although applicable to an original issue of bonds, contains no provision that such bonds not issued in conformity therewith shall be void, either in favor of creditors or at all.

Id.—Original Bonded Indebtedness.—The provision of section 11 of article XII of the constitution, declaring that the stock and bonded debt of a corporation shall not be "increased" except at a meeting called upon sixty days' notice, does not restrict an original bond issue.

Id.—Bond Issue not Ultra Vires.—The failure to observe the requirements of section 359 of the Civil Code in reference to the manner of issuing the bonds does not render their issuance *ultra vires* and void, if the corporation has received and holds the proceeds of the sale of the bonds.

Id.—Admission of Corporate Existence—Conclusiveness of Admission.—An admission by answer of an averment of the complaint that a corporation has its existence under the laws of Arizona, is conclusive, and cannot be controverted either by the evidence or the findings.

Id.—Collateral Attack on Organization of Corporation.—In an action in this state, to cancel bonds issued by a corporation existing under the laws of Arizona, an objection that the proceedings for the organization of the corporation as such were invalid, because the

incorporators met to organize in California and held no meeting in Arizona for that purpose, cannot be so collaterally raised. Such an inquiry can be made only in a direct action for that purpose instituted by or under the authority of Arizona.

Id.—Laws of Arizona—Increase of Capital Stock—Filing and Publication of Amended Articles.—Bonds of an Arizona corporation, which were actually sold and delivered for value after compliance with all the requirements of the laws of that territory respecting the recordation and publishing of amended articles of incorporation increasing its capital stock, are not rendered void as to other creditors, merely because the stockholders' meeting authorizing the bond issue was held prior to the date of the filing of the amended articles in the office of the auditor of the territory, and prior to their publication as required by the law of that territory.

APPEALS from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Charles Monroe, Judge.

The facts are stated in the opinion of the court.

Lee C. Gates, Charles L. Batcheller, W. S. Wright, Gray, Barker & Bowen, Oscar A. Trippet, and J. M. & H. L. Rothchild, for Appellants.

Jefferson P. Chandler, and Jonathan R. Scott, for Plaintiff and Respondent.

W. S. Wright, and Gray, Barker & Bowen, for Respondent Oak Knoll Co.

SHAW, J.—Appeals are presented from the judgment and from an order denying the appellants' motion for a new trial. So far as the judgment is in favor of the Oak Knoll Company, there is no appeal and, as that part of it was not attacked by the motion for a new trial, it has become final, as to that defendant.

The Wentworth Hotel Company claims to be a corporation organized under the laws of Arizona. It was adjudged an insolvent under the Insolvency Law of California on July 12, 1907, upon a petition by certain creditors filed on May 24, 1907. Henry S. McKee was duly appointed as the assignee in insolvency of said company. It was incorporated in April, 1906, with a capital stock of three hundred and fifty thousand

dollars in shares of one hundred dollars each. Its articles empowered it to build and operate hotels. Its principal business was the erection and operation of a large hotel at Oak Knoll, near Pasadena. Stock was issued and fully paid up to the amount of $320,120. The hotel was begun and in November, 1906, was not yet completed. Its first estimated cost was six hundred thousand dollars. Its actual cost when completed in February, 1907, including furnishings, was near one million dollars. It had in November, 1906, expended all its funds and had incurred debts to the amount, as was supposed, of three hundred and twenty-six thousand dollars, afterwards found to be three hundred and fifty thousand dollars. The debts were pressing and further expense was necessary to complete the hotel and put it in operation. Some of the creditors had consented to an extension, and with this relief it was estimated that two hundred and sixty thousand dollars would suffice to pay the pressing claims and complete and furnish the hotel. To obtain this sum the hotel company increased its authorized capital stock to six hundred thousand dollars and authorized a bonded debt of three hundred and fifty thousand dollars, to be evidenced by three hundred and fifty bonds of one thousand dollars each. This was done on December 7, 1906. The bonds were secured by a mortgage on all of its property, executed to the Title Insurance and Trust Company, as trustee. Two hundred and seventy-five of them, amounting to two hundred and seventy-five thousand dollars, were issued and are now held by the appellants, other than Rogers, Macomber, May, and said trustee. The object of this action is to cancel said two hundred and seventy-five bonds and declare said mortgage, to that extent, void. The court below gave judgment for the plaintiff.

The plaintiff bases his claim that the bonds are invalid upon the following grounds: 1. That they were issued and delivered to said appellants as a gift, and without consideration; 2. That the transaction whereby they were issued and delivered to said appellants was fraudulent and void as to creditors; 3. That the bonds were not issued in compliance with section 359 of the Civil Code of this state; and 4. That they were not issued in compliance with the laws of Arizona.

It is unnecessary to consider the sufficiency of the complaint on these points. The facts are set forth in more detail in the

findings. Many of them are admitted to be correct, and all the important points are involved in the consideration of the sufficiency of the findings to support the judgment and the sufficiency of the evidence to sustain the findings challenged.

1. Assuming, for the present, that the officers of the Wentworth Hotel Company were empowered to execute the mortgage and bonds, we take up the question of their consideration. The following facts show upon what consideration the appellants obtained the bonds. The hotel company made a written agreement with the William R. Staats Company, a corporation, to the effect that the Staats Company, as agent for the hotel company, should sell twenty-six hundred shares of the capital stock of the hotel company of the par value of two hundred and sixty thousand dollars, at par, to be issued to the purchasers as full paid stock, when sold and paid for, for which services as its agent the hotel company agreed to issue and deliver to the Staats Company bonds of the hotel company of the face value of two hundred and seventy-five thousand dollars and fifteen thousand dollars in its full paid capital stock. Bonds were issued, the stock sold, and the two hundred and sixty thousand dollars was received and used by the hotel company. The Staats Company itself subscribed and paid fifteen thousand dollars of the two hundred and sixty thousand dollars, receiving therefor the agreed amount of stock and bonds. As the stock was sold, the Staats Company delivered therewith to each purchaser bonds to the amount of 105 per cent upon the par value of the stock sold to him, and stock to the amount of 105 per cent of the quantity subscribed, making in all two hundred and seventy-three thousand dollars in bonds at face value and two hundred and seventy-three thousand dollars of stock at par. The court found, in effect, that it was never intended that the aforesaid written agreement should be the real agreement, that it was understood between the hotel company and the Staats Company that the latter should receive the bonds and the fifteen thousand dollars of stock mentioned therein, to be used in securing the sale of the two hundred and sixty thousand dollars of stock and that the stock "was to be subscribed for and paid for at its par value," that the Staats Company never expected to receive the bonds and the fifteen thousand dollars

of stock for its own use or as compensation for its services in selling the stock, that the agreement was made for the purpose of selling the stock and having it paid for in full, so that the buyers might avoid assessments and receive the bonds without any consideration, that the buyers paid for the stock in full and received the bonds "without any consideration being paid therefor at all, *as shown by their subscription,*" that it was agreed by the hotel company and the Staats Company that the Staats Company never had and never was intended to have any interest in or claim to any of said bonds on its own account, but was to act merely as agent or intermediary for the transfer of said bonds by the hotel company to the purchasers of said two hundred and sixty thousand dollars of stock, that it was this actual agreement that was actually performed and carried out, and that the Staats Company never acquired any interest on its own account in any of said bonds, except such as it obtained by becoming a buyer of a part of said stock. As between the hotel company and the buyers of said stock the court found that the understanding was that all the money and consideration paid by the buyers to or for the use of the hotel company was to be paid and applied exclusively in payment for said stock, and it was so exclusively paid and applied, the purpose being to make it fully paid-up stock. Although not expressly so stated, the necessary conclusion from the findings is that the Staats Company, notwithstanding the written agreement, did not in fact charge anything for its services in selling the stock, but performed that service gratuitously.

It is claimed by the appellants that these findings are contrary to the evidence. The oral testimony showed, without conflict, that this written agreement between the hotel company and the Staats Company was not the real agreement, that the Staats Company did not intend to charge, and did not in fact charge or receive for its services in selling the stock anything more than two of the bonds and twenty shares of the stock, and that the 273 bonds and the 130 shares of stock which were transferred to stock buyers were placed in the hands of the Staats Company to be offered and transferred to the buyers as a bonus, to induce them to buy the 2600 shares of stock. In other words, the purpose was to enable the Staats Company to sell the stock and bonds at the rate

of 210 shares of stock, par value twenty-one thousand dollars, and twenty-one bonds, face value twenty-one thousand dollars, for twenty thousand dollars in money, being a price equal to the par value of 200 shares of stock. The reason for the giving of this bonus was that it was impossible to sell the stock or the bonds upon better terms or to raise two hundred and sixty thousand dollars for the hotel company in any other way, and it was absolutely necessary to obtain that amount of money immediately in order to pay the pressing debts of the company and save it from utter financial ruin and bankruptcy, and carry on the building and furnishing of its hotel to completion so that it could be occupied. The evidence also shows that the officers of the hotel company and of the Staats Company who managed the affair all believed that if the stock was sold for less than par, the holders could be made to pay the difference for the benefit of creditors, that the fact was that buyers could not be induced to assume such liability, and that this plan and agreement were contrived so that, on the books of the hotel company, it would appear that the 2,600 shares of stock had been paid for at their full par value.

In execution of this plan the Staats Company drew up a contract between itself as agent for the hotel company and the several buyers of the stock. Each buyer signed said contract at the time of his purchase. So far as the buyers, with two or three exceptions, are concerned, this contract represents the sum of their knowledge of the aforesaid purposes and transactions of the hotel company and its said agent. The contract with the buyers was dated November 27, 1906, being drawn in advance of the order authorizing the increase of stock and the execution of the bonds and mortgage. It recited that the hotel company required two hundred and sixty thousand dollars to complete its hotel so as to enable it to receive guests for the ensuing season, that it proposed to increase its capital stock to six hundred thousand dollars, and issue first mortgage bonds to the amount of three hundred and fifty thousand dollars, and that it had employed the Staats Company to sell its stock "to the amount of face value of $260,000." The agreement of sale and purchase therein was as follows:—

"We, the undersigned, hereby subscribe for and agree to take and pay for at par value of $100 a share the number

of shares of the capital stock of the Wentworth Hotel Company here set opposite our names; and we agree to pay for the same to the said corporation, said payment to be made at the office of Wm. R. Staats Company, as follows: (Here follows the dates of payment and percentage of the respective installments, five in all, aggregating 100 per cent.) No subscriber shall be bound until subscription to the said capital stock to the amount of $260,000 face value shall be subscribed for on this plan. . . . An additional consideration for this subscription is the agreement on the part of the Wm. R. Staats Company *for itself only* as attached hereto, that it will pay to each subscriber hereto and on fulfillment of the terms hereof and upon payment of each installment of said subscription price, an amount of the bonds of the Wentworth Hotel Company equal in face value to 105% of the amount of said subscription installment so paid; also shares of the capital stock of said hotel company of par value equal to 5% upon the face value of each subscription." (Italics ours.)

Following this are the signatures of the subscribers, opposite which are written the number of shares taken by each, aggregating 2,600 shares, and the amounts in dollars, aggregating two hundred and sixty thousand dollars. Appended is the agreement of the Staats Company that it will deliver the bonds, stocks, and certificates as provided in the subscription agreement.

This paper, upon its face, even when taken in connection with the agency agreement between the hotel company and the Staats Company, and the other facts found, shows that there was a valuable consideration for the bonds. It expressly states that the bonds and five per cent additional stock were to be delivered as "an additional consideration for this subscription"; it implies a purchase of the bonds, as well as of the particular shares of stock formally "subscribed," and all in consideration of the sums agreed to be paid. These bonds and the extra stock are, in effect, declared to be sold with the "subscribed" stock, as a bonus, or inducement for the subscription. The bonds were in fact the property of the hotel company and were furnished by it as a part of what the purchasers bought and received for their money. They were in the nature of "boot," which is defined as something given "to make up for deficiency in value in one of the things

exchanged." (Webster's Dict.) Even if they had been, as
the contract implies, the property of the Staats Company,
nevertheless, by the very terms of the contract, they would
have been received by way of bargain and sale and not as
a gift. The false implication as to the ownership would not
alter the legal effect of the transaction. The court found
and the evidence shows that the entire block of 2,750 shares
of stock and the 275 bonds, combined, were not worth, at
the time, more than two hundred and sixty thousand dollars,
and that none of the buyers would have bought or paid for
any of the stock or any part thereof, without the agreed share
of the bonds and extra stock. The two hundred and sixty
thousand dollars paid for the stock was all received by the
hotel company and it was thereby enabled to complete and
operate the hotel. Under all these circumstances and consid-
ering the real nature of the transaction, it cannot be justly
said that the two hundred and sixty thousand dollars was
paid for the stock alone and that the bonds and extra stock
were a gift by the Staats Company. It does appear, indeed,
that the buyers desired to avoid liability to assessments for
the benefit of creditors as upon stock not fully paid, and
that the scheme was devised to make it appear from an inspec-
tion of the hotel company's books that the stock was paid up
and that the bonds had been sold to the Staats Company. But
when we strip the business of these false clothes and come
down to the true case, we must take it as we find it, and the
truth is that the buyers insisted upon receiving all these bonds
and stocks for the two hundred and sixty thousand dollars
paid by them, and that the entire quantity of bonds and
stocks did not exceed that sum in value. Each constituted
a part of the real consideration for the money paid, and they
all constituted the whole of that consideration. The finding
that the money paid constituted the entire value of all the
stocks and bonds received in return, establishes the ade-
quacy of the consideration. If, in attempting to apportion
the price paid, we reject the written agreements and regard
the transaction as it really was, it is obvious that the bonds
constituted the chief value of that which was paid for by the
two hundred and sixty thousand dollars. They constituted a
first lien on the entire corporate assets. Before any substan-
tial value could be attributed to the stock, the bonds would

have to be deducted from the assets. The stock would represent only the surplus, if any there was. The statement that the stock and bonds taken together were worth only two hundred and sixty thousand dollars, and that the buyers would not take either without the other, therefore means that there was no surplus of value in the corporate assets over and above the two hundred and seventy-three thousand dollars of bonds and that the corporate property value was really less than the two hundred and sixty thousand dollars. The bonds did not mature for ten years, and under the doctrine of *Hunt* v. *Ward*, 99 Cal. 612, [37 Am. St. Rep. 87, 34 Pac. 335], and subsequent decisions following it, the personal liability of the stockholders for the principal of the debt created by the execution of the bonds would be barred before the bonds would mature and could not add anything substantial to their value. Consequently, the amount which was added to the bond value by the buyers, to make up the two hundred and sixty thousand dollars which they paid, must have consisted of the value of the advantage they secured by becoming stockholders and thus acquiring a right to share in the future profits which were expected from the hotel. There is no apportionment of these respective values and no evidence concerning them. As a matter of fact, therefore, there was a valuable consideration paid by the buyers to the hotel company, both for the bonds and the stock. The finding that the bonds were without consideration is contrary to the evidence. The case is practically identical in this respect with *Memphis etc. R. R. Co.* v. *Dow*, 120 U. S. 299, [7 Sup. Ct. 482, 30 L. Ed. 595]. There the corporation had exchanged its bonds of the face value of two million, six hundred thousand dollars, and its stock of the par value of one million, three hundred thousand dollars, for certain railroad property which, after the exchange, constituted its entire assets. The one million, three hundred thousand dollars in stock was issued as fully paid stock. The property received in exchange for the stock and bonds was worth only one million, three hundred thousand dollars. It was claimed that the bonds were without consideration. The corporation was created under the laws of Arkansas. The constitution of that state provided that no "corporation shall issue stock or bonds, except for money or property actually received, or labor

done; and all fictitious increase of stock or indebtedness shall be void"; which is substantially identical with section 11 of article XII of the constitution of California. The court said that this provision "does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations—at least when acting with the approval of their stockholders—in the exchange of their stock or bonds for money, property, or labor, upon such terms as they deem proper; provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden. . . . There was, consequently, no fictitious increase by appellant of its stock or indebtedness. Under these circumstances it cannot be fairly said that the bonds secured by the mortgage were issued without any consideration whatever actually received in property."

The finding that the papers were drawn with the intent to make it appear that the stock was full paid and not subject to calls for the payment of corporate debts, does not establish want of consideration for the bonds. Its significance, if any, lies in its bearing upon the question whether the transaction was, or was not, fraudulent as to creditors.

2. There is no charge that there was any actual fraud in these transactions, and the evidence shows that the parties were all acting in the utmost good faith, with the intent and purpose to save the enterprise from failure and ruin and to pay all the debts in full, and in the expectation of realizing a profit from its operation. The decision that the bonds are invalid can be upheld only upon the theory that the transaction was either constructively fraudulent as against the creditors, or that it was against public policy, or that the bonds were issued in a manner contrary to the imperative mandate of the law and are therefore not binding upon the company.

The respondent claims that the sale of the bonds was made with the intent to hinder, delay, and defraud creditors and

that it was therefore fraudulent and void, under the provisions of sections 3439 and 3442 of the Civil Code. The assets of the hotel company were, at the time, sufficient in value to pay the existing debts, but the corporation was unable to pay its debts as they became due. It is said that the last-mentioned fact made the company insolvent. (Civ. Code, sec. 3450; *Sacry* v. *Lebree,* 84 Cal. 49, [23 Pac. 1088].) This fact alone, however, does not make the sale of the bonds fraudulent, nor raise a presumption of fraudulent intent. To make such a transfer conclusively fraudulent, under section 3442, it must be made "voluntarily, or without a valuable consideration." This, as we have seen, was not the case here. The sale does not come within the provisions of section 3442. In order to establish a fraudulent sale under section 3439, proof of an intent to hinder, delay, or defraud creditors was necessary. The evidence does not show the intent required to make a transfer fraudulent within the meaning of that section. In every case where a person who is indebted borrows less money than the sum of all his debts and secures the lender by a first mortgage on all his property, the lender intends to hinder and delay the other creditors so far as may be necessary to make his mortgage a first lien. But such hindrance and delay is legitimate and lawful and does not constitute fraud. The purchasers of the bonds here in question were under no obligation, as such, to the creditors of the hotel company. It was not unlawful or fraudulent for them to loan money to that company and exact as security a mortgage upon all of its property, which would be prior and paramount to the claims of all other creditors. The whole purpose of the loan was to supply funds to pay to the other creditors and put the property in such condition that it could be operated, to the end that all debts should be paid, and the stockholders obtain dividends out of the profits. There is nothing in this to which any creditor has a right to object.

The design against the creditors, such as it was, did not have reference to the bonds, but to the stock. The buyers did not want to become owners of partly paid-up stock, because they feared that as such they could be made to pay calls for the unpaid portion of the par value. To avoid this possibility the plan above detailed was devised to make the books show that the stock was sold at par and was fully paid for. If

this was constructively fraudulent and for that reason void as to creditors of the corporation, it may be that in equity the creditors could have a judicial determination of the part of the price paid which was justly applicable to the stock, and could enforce calls for the balance of the par value. This is not the object of the present suit and no such relief can be given here. The company has the lawful right, the same as any natural person, to sell its bonds for any price it can get, provided it acts in good faith, and mere inadequacy of price does not avoid them. The fraud, if such it be, in the sale of the stock, cannot be transferred to the bonds and made available as a foundation for their cancellation. It is available only upon an inquiry concerning the liability of the stockholders for calls as for unpaid subscriptions. We find no ground upon which the transaction can be adjudged fraudulent with respect to the bond issue.

There is no rule of public policy or law of this state which forbids a corporation from discounting its notes or bonds. It is a common custom and it has never been held unlawful. The code provides that no corporation shall issue stock or bonds, "except for money paid, labor done or property actually received," and that any "fictitious increase" of stock or indebtedness is void. (Civ. Code, sec. 359.) The same provision is in the constitution. (Art. XII, sec. 11.) This does not forbid the sale of bonds at a discount. It was so held with regard to stock in *Stein* v. *Howard,* 65 Cal. 616, [4 Pac. 662], and *Union L. & T. Co.* v. *Southern C. M. R. Co.,* 51 Fed. 840. The ruling in *Stein* v. *Howard* was modified in *Vermont M. Co.* v. *Declez,* 135 Cal. 585, [87 Am. St. Rep. 143, 56 L. R. A. 728, 67 Pac. 1057], where it was held that if stock was issued as fully paid which was in fact only one fifth paid, the creditors could compel the levy of an assessment or call for the balance so far as necessary to pay their debts. This was put upon the ground that the corporate assets, including sums justly due for stock sold, are held by the corporation in trust for the payment of its debts and, where the corporation is insolvent, cannot be given away, or placed beyond reach of creditors, by the device of selling it to the original subscribers at a large discount. This so-called "trust fund" doctrine has no application to bonds. They are not assets of the corporation within the meaning of this rule. The prin-

ciple of *Stein* v. *Howard* is therefore fully applicable to the statutory and constitutional provision, so far as bonds are concerned. There are many cases where similar transactions have been considered and in none of them has it been held that, in the absence of actual fraud, such sales of bonds and stock are against public policy, or constructively fraudulent against creditors. In *Handley* v. *Stutz,* 139 U. S. 430, [11 Sup. Ct. 535, 35 L. Ed. 227], involving a stock sale only, and therefore stronger against respondent than the case at bar, the court says: "So long as the transaction is *bona fide,* and not a mere cover for 'watering' the stock, and the consideration obtained represents the actual value of such stock, the courts have shown no disposition to disturb it. . . . The general rule that holders of stock, in favor of creditors, must respond for its par value, is subject to exceptions where the transaction is not a mere cover for an illegal increase." A case substantially the same as the case at bar is *Coe* v. *East & West R. Co.,* decided by the United States circuit court for the northern district of Alabama, reported in 52 Fed. 531, affirmed by the United States circuit court of appeals as *Grant* v. *East & West R. Co.,* 54 Fed. 569, [4 C. C. A. 511]. The corporation bought a railroad, paying therefor seven hundred and fifty thousand dollars by issuing and delivering three hundred and seventy-five thousand dollars in stock and three hundred and seventy-five thousand dollars in bonds. The subscription to the stock stated that the railroad was of the value of three hundred and seventy-five thousand dollars and that the stock was to be paid for by a transfer of the railroad, but the evidence showed that the subscriber really exchanged the railroad for both the bonds and the stock. The railroad was in fact worth only three hundred and seventy-five thousand dollars. It was held that the transaction was just and lawful and not in contravention of a constitutional provision similar to that of California on the subject. (See, also, *Fogg* v. *Blair,* 139 U. S. 125, [11 Sup. Ct. 476, 35 L. Ed. 104]; *Pollitz* v. *Wabash R. Co.,* 167 Fed. 160; *Zeigler* v. *Lake St. etc. Co.,* 99 Fed. 114, [39 C. C. A. 431]; *Van Cott* v. *Van Brunt,* 82 N. Y. 539; *Drummer* v. *Smedley,* 110 Mich. 476, [68 N. W. 260, 38 L. R. A. 490]; *Elyton etc. Co.* v. *Birmingham etc. Co.,* 92 Ala. 407, [25 Am. St. Rep. 65, 9 So. 134, 12 L. R. A. 307].)

The court made a finding that the hotel company, at the time

of this transaction, was a "going concern." The evidence shows that it was not then contemplating insolvency nor endeavoring to wind up its affairs, but that it raised the money for the purpose of carrying on in good faith the business mentioned in its articles of incorporation. Some decisions have made a distinction between transactions of this kind where the corporation is a going concern and those where it is an endeavor to close up its affairs and cease business, holding the latter circumstance sufficient to avoid the issue of stocks or bonds. In view of the finding, which is amply sustained by the evidence, the distinction is of no importance.

The case of the *Vermont Marble Co.* v. *Declez*, 135 Cal. 585, [87 Am. St. Rep. 143, 56 L. R. A. 728, 67 Pac. 1057], which is relied on by the respondent, is not to be understood as declaring the broad doctrine that in every case where stock of a corporation is disposed of as paid-up stock at less than par value, the creditors can compel the payment for their benefit of the difference between the par value of the stock and the actual value of the consideration given therefor. In that case the original incorporators in making their contributions to the original capital stock, agreed that they would issue the stock as full paid, upon the payment of only twenty per cent of the par value. There was no occasion or necessity for this and it was not, in any proper sense, a sale of the stock at a discount, but a mere device for making the book value of the stock appear to be more than the money paid in by the incorporators. But however the law may be in the case of stock, the decision has no bearing upon the case of a sale of bonds in good faith by a going concern, where it is necessary for the payment of debts incurred in such business and to keep the business going.

3. Section 359 of the Civil Code declares that "every corporation . . . may create or increase its . . . bonded indebtedness, subject to the following provisions": among which are that the indebtedness of a corporation may be created or increased by two thirds of the stockholders, that certificates of such increase or creation must be filed in the office of the clerk of the county in which the original articles are filed, and that a copy thereof must be filed with the secretary of state. None of these conditions have been performed. No attempt was made to comply with the section.

The respondent claims that the failure to observe these

requirements of the law of this state make the bonds absolutely void. The court below, after finding facts showing that this law was not complied with, stated as a conclusion of law that section 359 did not apply to corporations of other states, doing business here, and that the failure to observe it did not invalidate the bonds. The appellants insist that the respondent is bound by this part of the decision below. We do not so understand the rule. The findings state the facts fully. The final conclusion of the trial court was that, upon all the facts stated, the plaintiff was entitled to judgment cancelling the bonds. On appeal from this judgment, upon the question whether or not the judgment is sustained by the findings, all the facts are presented for our consideration. This court is not bound by the opinion of the trial court as to the effect or application of certain facts found, or as to the law relating thereto, nor by the method of reasoning by which that court reached its final conclusion that the bonds are void. If, upon considering all the facts and the law as we understand it, we are satisfied that the final conclusion of the trial court was right, the judgment will be upheld and the erroneous reasoning of the trial court will be disregarded.

Section 359 was evidently framed with a view only to its application to corporations organized under the laws of California. A foreign corporation could not literally comply with it. But we do not find it necessary to decide whether or not it could be substantially followed and enforced against foreign corporations issuing bonds in connection with business done by them in this state. Conceding, for the purpose of the argument, that it could and, under section 15 of article XII of the constitution, should be so applied, the failure to observe its requirements does not make the bonds void at the option of creditors, or of one acting in their interest. We have shown that a valuable consideration was received for the bonds and that there was no fraud in issuing them. Therefore, upon the authorities hereinbefore cited, there was a sufficient compliance with the provision in section 359, and in section 11 of article XII of the constitution, that bonds cannot be issued except for money paid, labor done, or property actually received. That part of our laws was not violated. A construction which would make such bonds void in the hands of a holder for value, at the instance of other creditors, would be

against equity and justice and should not be favored. The provision in section 11 of article XII of the constitution declaring that the stock and bonded debt shall not be "increased," except at a meeting called upon sixty days' notice, does not purport to restrict an original bond issue. Being a restriction of the inherent right to freely contract, its meaning is not to be unnecessarily extended beyond its fair import. It has been held that it does not apply to an original issue of bonds. (*Union L. & T. Co.* v. *Southern Cal. M. R. Co.*, 51 Fed. 850.) We approve that decision. Section 359 does apply to an original issue of bonds, but there is no provision that such bonds not issued in conformity therewith shall be void, either in favor of creditors or at all. The only inhibitory clause is in subdivision 5 and it refers solely to an *increase* of stock or bonds and, for the reason just stated, does not forbid an original issue. The provision for a public notice was clearly not intended as a means of giving notice to existing or future creditors, for it is accompanied and supplemented in subdivision 5 by a method authorizing an original issue of bonds, without any notice or meeting, upon the written assent of the holders of two thirds of the stock, and the unanimous action of the directors. So far as such original issue is concerned, the proceedings were evidently intended only as a protection to the stockholders against such issue without the consent of those having a two-thirds interest, and not for the protection of creditors. No stockholder is here asserting any right, or making any objection. The assignee in insolvency represents the interests of the creditors only. He is not suing on behalf of the stockholders or in their interest, and, there being no fraud, he stands in the shoes of the corporation with regard to the bonds. The corporation has received the money obtained by means of the bonds and has applied it to the payment of its debts and the completion of the hotel. The money has thus inured to the benefit of the corporation and its stockholders and of the general creditors also, since it has unquestionably given a substantial value to a structure which would otherwise be comparatively worthless. The corporation is therefore estopped to dispute the validity of the bonds and the creditors are likewise bound thereby. The real point of the objection is that the manner of issuing the bonds was so defective that the transaction was *ultra vires,* and void, notwithtsanding that

the corporation received and holds the benefits thereof. In regard to a similar claim the New York court of appeals said: "That kind of plunder which holds on to the property but pleads *ultra vires* against the obligation to pay for it, has no recognition or support in the laws of this state." (*Seymour* v. *Association,* 144 N. Y. 333, [39 N. E. 365, 26 L. R. A. 859].) The following cases declare that neither the corporation nor its creditors can, under like circumstances to those here existing and under similar provisions of the law, maintain such an attack on bonds irregularly issued, and that the provisions of such laws are for the protection of stockholders only. (*Anderson* v. *Bullock Co. Bank,* 122 Ala. 275, [25 South. 523] ; *Bishop* v. *Kent,* 20 R. I. 685, [41 Atl. 257] ; *Rochester Bank* v. *Averell,* 96 N. Y. 475; *Paulding* v. *Chrome Steel Co.,* 94 N. Y. 334; *In re New York Economical Pr. Co.,* 110 Fed. 519, [44 C. C. A. 133] ; *Hervey* v. *Ill. Midland Ry. Co.,* 28 Fed. 174; *Manhattan Hdw. Co.* v. *Phelan,* 128 Pa. St. 110, [18 Atl. 428] ; *Wood* v. *Corry,* 44 Fed. 150, [12 L. R. A. 168] ; *Nelson* v. *Hubbard,* 96 Ala. 252, [11 South. 428, 17 L. R. A. 375] ; *Eastman* v. *Parkinson,* 133 Wis. 375, [113 N. W. 649, 13 L. R. A., N. S. 921].) In *Boyd* v. *Herron,* 125 Cal. 453, [58 Pac. 64], it was a stockholder who made the objection and it was in defense to a suit to enforce his individual liability as such stockholder. It comes clearly within the rule that the provision is for the benefit of stockholders and it does not conflict with the cases just cited. On the contrary it expressly avoids deciding that any one other than a stockholder could make such defense and it concedes the proposition above stated.

The complaint avers and the answers admit that the hotel company is and has been ever since April 12, 1906, a corporation existing under the laws of Arizona. This is a conclusive admission, not to be controverted either by the evidence or the findings. Hence the claim that it is only a *de facto* corporation of California is without foundation. Moreover our conclusion, that the objection that section 359 was not observed cannot be here asserted, makes this point immaterial. The objection that the proceedings for the organization of the hotel company as a corporation were invalid, because the incorporators met to organize in California and held no meeting in Arizona for that purpose cannot be raised in this collateral action. Such an inquiry can be made only in a direct action for that purpose

instituted by or under the authority of the territory of Arizona. (*Los Angeles Holiness Band* v. *Spires,* 126 Cal. 545, [58 Pac. 1049].)

4. The respondent intimates that the laws of Arizona were not complied with. That law did not allow the company to incur a debt exceeding two thirds of its capital stock. The original stock was three hundred and fifty thousand dollars and it could not issue three hundred and fifty thousand dollars in bonds until its capital was increased. Amended articles raising the capital stock to six hundred thousand dollars were filed in the office of the county recorder of the proper county in Arizona on December 7, 1906, but they were not filed in the office of the auditor of the territory until December 10th and the publication required by law was not complete until December 21st. The stockholders' meeting in Arizona to authorize the bond issue was held on December 7th. The law of Arizona provides that an amendment of articles increasing the stock shall not be valid "unless recorded and published as the original articles are required to be." Original articles are to be recorded only in the office of the county recorder. The corporation may commence business as soon as its articles are filed for record in the county recorder's office and a certified copy thereof filed in the office of the territorial auditor, and its acts shall then be valid if the required publication is made within three months from the filing in the recorder's office. Whether this would prevent the bonds from becoming valid obligations, prior to the filing of a copy of the articles in the office of the territorial auditor or not, we are satisfied that it does not make them void at the instance of other creditors when they have been actually sold and delivered for value after all these provisions have been carried out, as was the case here.

There are no other points that require notice.

The judgment and order are reversed.

Angellotti, J., and Sloss, J., concurred.

Hearing in Bank denied.