[Civ. No. 1018.    Third Appellate District.—October 28, 1912.]

## S. J. HOPKINS, Respondent, v. ROLAND J. WHITE, W. B. MACNIDER and HARRIETTE MACNIDER, Appellants.

FRAUD UPON CREDITORS—ASSIGNMENT OF INTEREST IN ESTATE—FINDINGS AS TO FRAUD UNSUPPORTED BY EVIDENCE.—Under the evidence, it is held that the findings, in the present action on the issue of fraud upon creditors, or want of consideration, or as to any actual or constructive fraud, are not supported by the evidence.

ID.—ACTUAL AND CONSTRUCTIVE FRAUD—QUESTION OF FACT—PLEADING. Actual fraud is always a question of fact; and in order to constitute constructive fraud, as matter of law, it must be set forth dis-

tinctly in a pleading alleging the fraudulent intent, under section 3442 of the Civil Code.

ID.—INTENT TO DELAY OR DEFRAUD CREDITORS—QUESTION OF FACT.— The transfer of property with the intent to delay or defraud creditors under section 3439 of the Civil Code, makes such intent a question of fact, which is not to be presumed from the mere fact of the transfer. A debtor may pay one creditor in preference to another; and it is only when the transfer is voluntary or without consideration, or in contemplation of insolvency, that it is void as to existing creditors.

APPEAL from a judgment of the Superior Court of Sonoma County and from an order denying a new trial. Thos. C. Denny, Judge.

The facts are stated in the opinion of the court.

W. H. Early, for Appellants.

Lippitt & Lippitt, and Chas. F. Fury, for Respondent.

CHIPMAN, P. J.—This is an action to have a certain assignment of the interest of defendant Harriette Macnider, in her deceased father's estate, declared void. Plaintiff had judgment from which and from the order denying their motion for a new trial, defendants appeal.

It is alleged in the amended complaint that, on August 18, 1908, the defendants executed and delivered to plaintiff their promissory note for $1,679.40 and that, on August 2, 1910, plaintiff obtained a judgment against defendants, in an action upon said promissory note, for the sum of $1,702.40 and that said judgment is now in full force; that, on August 2, 1910, execution issued on said judgment against the property of defendants and was duly served on the land hereinafter referred to and became a lien thereon on August 4, 1910; that on September 12, 1909, defendant Harriette Macnider executed and delivered to defendant White an assignment of all her property, to wit, all of her right, title, and interest in the estate of her father, John C. Haskell, deceased, by which the said Harriette directed that the same be "distributed to and fully and absolutely vested in the said R. J. White, as the same would have been distributed to and invested in me if this assignment had not been made, whether the same be real

or personal property or both"; that at the time said assignment was executed the said defendant Harriette had no property other than that mentioned in said assignment and defendant, her said husband, was and is insolvent and that said assignment was made "with intent to delay and defraud the creditors of the said defendant, Harriette Macnider" and "was made without any consideration whatever passing from the defendant, Roland J. White, to the defendant Harriette Macnider" and that the "pretended indebtedness named and set forth in said assignment as due from said defendant, Harriette Macnider, to the said defendant, Roland J. White, was fictitious" and said Harriette was not at said time indebted to said defendant White "in any sum whatever." It is then alleged that subsequent to said assignment the estate of John C. Haskell, deceased, has been fully settled and distributed by the superior court of Los Angeles County and that upon the settlement and distribution of said estate the sum of $711.28 was distributed to defendant White and also "an undivided one-seventh interest of, in and to all that certain real estate described in the petition for distribution and in the decree of distribution in the matter of the estate of John C. Haskell, deceased, as follows, to wit": (then follows a description of the real estate the subject of the decree of distribution). The answer admits the execution of the said promissory note but denies any indebtedness to plaintiff; admits that judgment was had on said note but alleges that "immediately after said judgment was rendered they served notice in due and regular form of their intention to move said court for a new trial in said action and that said motion has not been heard and determined by said court"; admits the execution of said assignment but denies the averments of fraud and want of consideration in its execution and denies the alleged insolvency of defendants Macnider and denies that the indebtedness mentioned in said assignment was fictitious; alleges that said assignment was made for a good and valuable consideration and that all of its terms and conditions have been fully complied with and that said defendant White is the "absolute owner of all of said property without any right or interest therein to defendant Harriette Macnider or defendant W. B. Macnider or either or both of them."

The findings of fact follow substantially the averments of the complaint; that said assignment was without any consideration from defendant White to defendant Harriette Macnider; that the pretended indebtedness set forth in said assignment was fictitious and that said defendant Harriette was not indebted to defendant White in any sum whatever; that defendant Harriette, with full knowledge of her insolvency, made said assignment with intent to delay and defraud her creditors and that she has remained and still remains in possession. It is found that defendants, the Macniders, moved for a new trial in the action on said promissory note and that said motion has not been determined but that "there was no stay of proceedings in the said action"; that "ever since said assignment to said defendant, Roland J. White, the property therein mentioned has remained and still remains in the possession and under the control of said defendant, Harriette Macnider"; that defendant White is not the owner of said property so assigned to him but that it is the property of said Harriette Macnider.

As conclusions of law it was found that said assignment "is fraudulent and void as against this plaintiff and the said assignment should be set aside" and the property therein mentioned and subsequently distributed in said estate to defendant White "should be held and determined to be, and is the property of the said defendant, Harriette Macnider, so far as the plaintiff herein is concerned"; that defendant White "should account for all the property held by him under the terms of said written assignment, including the sum of $711.28"; that defendants be restrained from selling or in any way interfering with said property, "except as shall be further directed by the court"; that the undivided one-seventh interest in said real property is the property of said Harriette, "so far as this plaintiff is concerned, and should be sold for the purpose of satisfying" said judgment, and said defendant White "should pay over to plaintiff said sum of $711.28, distributed to him as found in the findings of fact, to be applied upon the said judgment in favor of plaintiff."

Judgment was entered accordingly. Substantially all of the findings are challenged for insufficiency of facts.

Whatever interest defendant White acquired by the assignment was merged in the decree of distribution and his title

is referable to and he is now holding and is claiming under the decree and not under the assignment. (*Toland* v. *Earl,* 129 Cal. 152, [79 Am. St. Rep. 100, 61 Pac. 914]; *Goad* v. *Montgomery,* 119 Cal. 552, [63 Am. St. Rep. 145, 51 Pac. 681].) The assignment was executed September 12, 1909; was duly acknowledged on September 13, 1909, and was duly recorded, in Los Angeles County, on September 30, 1909, where the land is situated and where the Haskell estate was being settled. The decree of distribution was entered June 20, 1910. The complaint was filed October 13, 1910, more than one year after the assignment was recorded and about four months after the entry of the decree of distribution. Plaintiff had constructive notice of the assignment and he also had notice of the proceedings on final account and distribution in the matter of the estate of Haskell, deceased.

Whether plaintiff had any remedy by which to have arrested the proceedings on distribution, so far as they related to defendant White or could, on proper showing, before the decree became final, have had it reopened, need not be now inquired into. It is very certain that the decree is final and conclusive. It is not open to collateral attack and can be set aside by direct attack only upon "some ground of fraud or other matter collateral or extrinsic to the questions examined in the proceeding leading to the decree." (*French* v. *Phelps,* No. 988, *ante,* p. 101, [128 Pac. 772], filed in this court, October 15, 1912, and cases there cited.) In that case the attack was collateral, being as to the sufficiency of certain evidence introduced in support of the decree of distribution, and it was held that even "if it could be shown that the testimony was altogether insufficient to support the decree, or that it was the result of forged documents or perjured testimony, all the parties interested having had their day in court in the proceeding in which the decree was made, we do not see how it could be successfully challenged for any of these reasons." (Citing cases.) The action here is not aimed at the decree but is directly aimed at a certain piece of evidence, to wit, the assignment, upon which the court acted in making distribution to defendant White. The effect of the action is to question, in an independent proceeding, the validity of a thing done in court, to wit, the entry of a decree in distribution. Such attack is necessarily collateral. To declare in

this action that this piece of evidence thus used was fraudulently contrived does not in the slightest degree impair the validity of the decree. It may be that a court of equity, under proper pleadings, would entertain an action to have White declared to be a trustee and holding the title for the benefit of his creditors, but the demand for judgment is "that the said assignment is fraudulent and void as against this plaintiff"; and, being void, that White "account for all property received by him as aforesaid." He received no property by the assignment; and not until distribution and only by distribution did he acquire title freed from administration. Nor does the prayer ask that plaintiff's judgment be declared to be a lien on the property. In its judgment, however, the court "set aside, annulled and declared to be null and void" the assignment; declared plaintiff's original judgment against the Macniders to be a lien on the property and that plaintiff "is at liberty to proceed upon his execution . . . and to sell the real property," etc. The judgment grants relief in excess of that prayed for and in its effect nullifies the decree of distribution without directly attacking it. Without appropriate averments in the complaint plaintiff has been given a judgment lien on property held by a title unimpeachable in this action.

We very much doubt the sufficiency of the complaint to support the findings and judgment. But, waiving the point, we are satisfied that the findings are not supported by the evidence.

The evidence adduced to establish fraud and want of consideration is to be found in the testimony of the defendants who were the only witnesses to the facts relied upon as establishing the averments of the complaint. In considering their testimony these witnesses are to be treated as having been voluntarily produced ·by plaintiff, vouching for their competency and credibility. The rule would not estop plaintiff from calling other witnesses to dispute their statements but this was not attempted. Some minor statements of the witnesses, apparently inconsistent with their positive statements of material facts, may be discoverable in their testimony, but these latter cannot for that reason be set aside and disbelieved. The conclusions deducible from positive statements of facts showing *bona fides* are not to be shaken by some comparison

of inconsistent statements with each other, unless these inconsistencies tend directly to establish the issues of fraud and want of consideration and clearly dispute the evidence of good faith. An instructive discussion of the rule is found in *Clark* v. *Krause*, 2 Mackey (D. C.), 559-571. We quote: "The analogies, as well as the reason of the law, are against the ascription to the defendant of any especial obligation in giving his personal testimony on demand of the complainant to create a case for his opponent by acquiescing in the imputation of bad faith while the charge remains unsupported by the testimony of a single adverse witness, or that unfavorable inferences are to be drawn from his failure to strengthen circumstances of alleged suspicion, supposed to be inconsistent with his positive statements." (Citing *Lingan* v. *Henderson*, 1 Bland. (Md.) 268; Alexander's Practice, 72; 2 Daniell on Chancery, p. 451.) Fraud may be inferred from circumstances but it cannot be left wholly to conjecture. (*Kerker* v. *Levy*, [140 App. Div. 428, 125 N. Y. Supp. 357].)

The testimony of defendants was taken by deposition and is mostly found in narrative form in the transcript. Defendant White testified that he was engaged in practicing law in the city of San Francisco; "that prior to the 12th day of September, 1909, the witness first represented the defendant W. B. Macnider, as his attorney in the case of People *v.* Macnider, and in the trial of W. B. Macnider in the matter of charges that were preferred against Macnider by plaintiff in the Elks Lodge of Petaluma; that Macnider had been arrested at the instance of S. J. Hopkins, plaintiff herein, on a charge of embezzling nearly seven thousand dollars; that witness succeeded in getting Macnider dismissed at the preliminary hearing in the justice's court of Petaluma, which lasted three or four days; . . . that defendant Macnider had appeared before the grand jury of Sonoma County on several occasions, and witness had accompanied Macnider to Santa Rosa on several occasions; that witness discussed these matters with Macnider prior to the time that Mrs. Macnider came to the office with him; that witness discussed these matters with him alone, and with her alone, and with them both together, day after day, practically half the summer; they were in witness' office almost daily for a long while; that witness expended money for and on behalf of defendant W. B.

Macnider, amounting to more than three hundred dollars; that witness did not keep an exact account of said expenditures. Witness further testified that all of the services rendered for the defendant W. B. Macnider were also performed at the instance of Mrs. Macnider principally; . . . that Macnider spoke to witness first about the employment of witness and subsequently Macnider and Mrs. Macnider both came to witness' office and they hired witness . . . that witness had no written agreement with W. B. Macnider or Harriette Macnider concerning his employment or fees: . . . 'I never made a statement of account to Macnider for my services and disbursements. I came to no agreement with Mr. Macnider or Mrs. Macnider as to the total amount due for services rendered, other than the assignment which was subsequently made, which was, as agreed upon, about the right charge to cover services for a period of about six months or a year, and the costs I had expended'; . . . 'Mr. Macnider, Mr. Early, the notary public and I were present when Mrs. Macnider executed the assignment. Mr. Early prepared it in the office of the notary public. They told me prior to the time that they received this property, or were about to receive it, prior to that time, in fact before he was arrested, or subsequent to his arrest and before his trial, they told me of this interest in the estate, which they expected . . . Macnider never made a promise to pay me at any definite time. He and his wife told me they couldn't pay any money at that time, but even before the death of Mr. Haskell they said they had this interest in his estate, and it was on that information that they had given me that I acted for Mr. Macnider and performed the services for him and expended the costs and expenses.' . . . Mrs. Macnider told witness that she expected money from her father, and would pay; 'I don't think that she expected him to die, but she expected to receive money from her father, who was living at that time'; that after the death of John C. Haskell, Harriette Macnider came to witness' office, and stated that Macnider was working down there, but they required what actual money he had received at that time to pay their immediate expenses, and to pay off some other indebtedness, and then she assured witness about getting money from her father and that she would pay witness, and that after the death of John C.

Haskell, Harriette Macnider wrote witness and told him about her father's death, and that the estate was in probate, and that she would pay witness; . . . Witness consulted with other attorneys pertaining to Macnider's case; . . . that witness consulted Mr. Early and Mr. Peart several times concerning the case and paid for it; that Mrs. Macnider knew that witness had employed other attorneys in the matter of her husband's case, and she did not object to it; in fact advised that witness employ other attorneys; that at the present time witness is square with the Macniders, as the assignment in question was taken in full satisfaction of witness' claim for services rendered and moneys expended for Macnider; that witness did not agree to give back any portion of the property to Mrs. Macnider or Mr. Macnider or to any one else; that witness has had absolute control of the one-seventh interest of Harriette Macnider in the Haskell estate since its assignment as his property; that witness has not accounted to Harriette Macnider for moneys received as income or anything from the assigned property, and does not intend to; that witness has nothing belonging to Harriette Macnider or W. B. Macnider; that at the time of taking the assignment witness did not agree to return any of the property or to account in any way to Mrs. Macnider and does not intend to; . . . that witness at no time knew anything concerning the financial standing of Harriette Macnider or W. B. Macnider; 'I know that Hopkins claimed that Macnider owed him the money that he was alleged to have taken, and for which he was arrested and charged, and that the suit entitled Macnider *v.* Hopkins determined that matter or was to have determined it in the shape of an accounting'; that at the time said assignment was made, witness had no conversation with Harriette Macnider or W. B. Macnider relative to defeating, delaying or defrauding any of their creditors; . . . that the property received by White under the assignment is of uncertain value; that if witness disposes of the property for less than its estimated value, he will not look to the Macniders for the deficit; that if it sells in excess of the estimated value, he will not account for the overplus."

Defendant Harriette Macnider testified that the ranch property of her father included some mining claims "but they had been pretty well worked out"; after her father's

death her brother lived on the ranch and after he left an old man had charge of it. "But since the death of her father the ranch has laid idle and rather neglected. She does not know of any income from the ranch since her father's death. Witness testified that she did employ Roland J. White as W. B. Macnider's attorney; that such employment was in November or December, 1908; that previous to the time witness employed Mr. White as Mr. Macnider's attorney, Mr. White had been looking up and getting a case prepared for Macnider; at the time Mr. Hopkins and Mr. Macnider were having trouble Mr. Macnider employed White first. 'The services to which I have referred were services rendered by Mr. White as attorney at law, representing Mr. Macnider in an action in the superior court against S. J. Hopkins, for an accounting and in the proceedings wherein Macnider was charged with embezzelement. Mr. White had been representing Mr. Macnider and preformed services for him three or four months before I made any arrangements with Mr. White for compensation. I made an arrangement with Mr. White in his office in San Franciso. It was not an agreement in writing. I was alone when I went to see him'; that previous to that, witness saw Mr. Peart and Mr. Peart said he thought Mr. White would take up the case and go on if witness would make arrangements about a settlement with White; . . . that after that White rendered services for Macnider; . . . that after witness talked with White, he continued to represent Macnider through November, December, January and probably February. An action was brought in Sonoma County by Mr. Hopkins against Mr. Macnider and myself upon a promissory note. Mr. White did not represent either Mr. Macnider or myself in that case; (there is no evidence that White knew of this indebtedness) ; . . . witness paid White $20.00 or $30.00 on account; 'I just made that one payment to Mr. White. It was for services for Mr. Macnider, and was to go on account. Mr. White had not given me any statement of his account at that time, but he had written for money several times. I have none of his letters.' . . . White told witness at the time the arrangement was made that he, White, would take witness' share in said estate as full payment for his services to Macnider and call it square. . . . Defendant White gave witness a receipt

when witness made said arrangement; witness has not that receipt; she misplaced the receipt and cannot find it; has looked for it in all her papers. It read that the assignment made by witness to White covers all his services rendered to Macnider. Mr. Early prepared the receipt after we had signed the agreement or paper that he made out. . . . After September 12, 1909, she had not received any letters from Mr. White and did not see him again until the day before she testified. . . . The first conversation the witness had with Mr. White, relative to his acting as Macnider's attorney, was around November, 1908. After that she saw him on an average of three or four times a month. . . . Witness was present in the office of Mr. Holton in Los Angeles, when the distribution of the estate was made.''

Much of the same ground is gone over in the deposition of defendant W. B. Macnider. Of the ranch which had been distributed he testified that one of the sons of deceased was in possession and harvested the crop of 1910; that different heirs visited the ranch at different times. We quote from the transcript: ''that witness saw Harriette Macnider, execute the assignment in question to Roland J. White; 'Mr. Early prepared the paper. He drafted it at our house, and Mrs. Macnider signed the paper in Mr. Clark's office in Santa Cruz (where the Macniders were then living.) I was present at that conversation at the house, between Mr. White and Mrs. Macnider, relative to the making of the assignment. Mr. Early and Mr. White went out and took a walk while my wife and I discussed the matter of making the assignment'; that witness saw Roland J. White give Harriette Macnider a receipt the day the assignment was made; that Roland J. White did not tell witness that day the amount of his bill for services rendered by him to the witness or how much Roland J. White had expended for Mr. Macnider prior to that time. 'I had an idea of how much he had expended for me, but I don't think it was discussed at that time. Mr. White never presented a bill for his services rendered.' ''

Macnider testified to the different matters in which White served him; to White's urging him to pay him or in some way to assure him that he would be paid; ''At one time White said that he, White, would not pay out much more out of his own pocket, and witness had his wife see him

and he said if witness could not get somebody to guarantee the payment he would not carry on the work. . . . I never secured White in any way except that I had my wife, Harriette Macnider, see White and guarantee White's compensation at a time that White thought he could not carry on the cases for me any longer, which was in the fall of 1908." Speaking of the assignment witness testified: "Witness and his wife had been endeavoring to square themselves with White, and Harriette Macnider thought the best thing they could do was to assign her interest over to White in payment, and White agreed to accept the assignment in full payment. . . . My wife made the assignment with the understanding that she assumed my obligations with him."

It appears from the deposition of the administrator of the Haskell estate that the inventory and appraised value of the real and personal property was $26,745.60, of which $24,700 was the value of the real estate; that a portion of the ranch was sold, before distribution, for one thousand eight hundred dollars less than its appraised value; that there remained for distribution $20,583.09, of which $4,981.07 was cash on hand. There is no evidence otherwise of the value of the ranch except in a letter received from an attorney at Los Angeles. White was led to believe that the value of the estate property was about thirty-five thousand dollars; as to its producing an income the evidence was that but little was realized. What the actual value of the land was when the assignment or the distribution was made does not appear. It appeared that after the death of Mr. Haskell "the ranch was in the possession of the boys who lived on the ranch; that Mr. Charles Macnider lived on the ranch three or four months after their return from the north."

Respondent contends that actual fraud is shown, but his principal reliance is—first, that Mrs. Macnider's engagement was that of a guarantor and, as it was not in writing, it was void under section 2793 of the Civil Code, and that the promise was not within any of the provisions of section 2794 of the same code; i. e., that the creditor did not "part with value, or enter into any obligation, in consideration of the obligation, in respect to which the promise is made, in terms or under circumstances such as to render the party making the promise the principal debtor"; and, second, that

the evidence established constructive fraud under section 3442 of the Civil Code, for that the transfer was made "voluntarily or without a valuable consideration, by a party while insolvent"; and also, under section 3439, for that the transfer was made "with intent to delay or defraud" creditors. We can discover no evidence in the record which in any just view can be said to support the claim of actual fraud, and actual fraud is always a question of fact. (Civ. Code, sec. 1574.) In a case where constructive fraud is relied on, it is necessary to allege the fraudulent intent, under section 3442. (*Schell* v. *Gamble*, 153 Cal. 448, [95 Pac. 870]. It is only by reason of the proviso in that section that fraud becomes established constructively or as matter of law. (*Cook* v. *Cockins*, 117 Cal. 140, [48 Pac. 1025]; *Gray* v. *Brunold*, 140 Cal. 615, [74 Pac. 303].) Section 1573 of the Civil Code provides that constructive fraud is—"any such act or omission as the law specially declares to be fraudulent." The transfer of property with intent to delay or defraud creditors is declared by section 3439 of the Civil Code to be void as to creditors. But the intent in such a case is a question of fact and is not to be presumed from the mere fact of the transfer, for section 3432 expressly provides that—"a debtor may pay one creditor in preference to another, or may give to one creditor security for the payment of his demand in preference to another." (*McKee* v. *Title Ins. & Trust Co.*, 159 Cal. 206-217, [113 Pac. 140].) It is only where the transfer is "made or given voluntarily, or without a valuable consideration, by a party while insolvent or in contemplation of insolvency," that the statute declares such transfer to "be fraudulent and void as to existing creditors." (Civ. Code, sec. 3442.)

Respondent devotes some attention to his claim that defendant Mrs. Macnider was merely a guarantor of her husband's liability. It seems to us a fair consideration of the evidence leads to the conclusion that she became a principal to whom as such, as well as to her husband, defendant White looked and had a right to look for payment. It is true that defendant Macnider, in his testimony, used the word "guarantee" in speaking of his understanding of the matter, but the testimony of Mrs. Macnider and of White, who were the parties to the engagement, shows that she employed White and

agreed to pay him for his services and did pay him. It is also true that White was first employed by Macnider and had performed some service for him before his wife came to his relief. But White refused to continue the employment under the original engagement and his services in large part were performed after Mrs. Macnider employed him and in good faith relying on her promise. In rendering services, White parted with value, and it seems to us that Mrs. Macnider entered into the obligation with White under such circumstances as to render her a principal debtor, by virtue of her promise, and thus, even under the law of guaranty, section 2794 of the Civil Code, she became liable.

Is constructive fraud shown? Was the transfer made "voluntarily, or without a valuable consideration by a party while insolvent"?

"A voluntary conveyance is a conveyance without any valuable consideration. . . . If there is a valuable consideration, no matter how trivial or inadequate, the conveyance is not voluntary." (Words and Phrases, Vol. 8, p. 7345, and cases cited.) The finding is that "the said assignment . . . was made without any consideration whatever passing from the defendant, Roland J. White, to the defendant, Harriette Macnider," and that "the said assignment was not made for a good or valuable consideration from said defendant, Roland J. White, to the defendant, Harriette Macnider." This is not a finding that the transfer was made "without a valuable consideration" and does not meet the requirements of the statute unless all the evidence of White's services must be disregarded because they were rendered in matters concerning Macnider and not directly for Mrs. Macnider. But if, as the evidence shows, the services were rendered at the instance and request of Mrs. Macnider and under her employment they must be regarded as rendered for her although performed in the interest of another, and there was, therefore, a consideration passing to her. There is no finding that the assignment was wholly without consideration and therefore voluntary. To make the transfer void as to creditors it must also have been without a valuable consideration by a party while insolvent. There was evidence that the Macniders had no considerable means with which to pay the claim of plaintiff, except the interest of Mrs. Macnider in her

father's estate. One of the actions in which White was employed was a suit for an accounting brought by Macnider against plaintiff, in which Macnider claimed that plaintiff was indebted to him. This claim was in existence at the time plaintiff held the promissory note of the Macniders and before suit was brought on the note. There is nothing in the record to show that at the time the assignment was made the Macniders were insolvent. It does appear, however, that as the litigation between plaintiff and Macnider finally ended, the Macniders had nothing left but the interest of Mrs. Macnider in her father's estate, and at the time of the trial of the present action they were insolvent. But aside from the alleged insolvency of the Macniders, which may be conceded, the findings are not supported by the evidence. Defendant White was engaged in the business of serving as attorney under Mrs. Macnider's employment for several months, during which time he advanced of his own money, as expenses, over three hundred dollars. Of the seven hundred and eleven dollars received on distribution, he paid Mr. Early three hundred dollars and his account with him and Mr. Peart for services as his associates in the business is unsettled. There is no evidence that the interest assigned to him is greatly or at all in excess of a reasonable fee for his services and advances of money. His interest, acquired by the distribution is of uncertain value. That his services constituted a valuable consideration cannot be doubted. If he was paid a sum grossly in excess of the value of his services or such a sum as would shock the conscience, it is not so made to appear, nor is it so alleged. No question of the inadequacy of the consideration is raised by the pleading.

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal, on November 27, 1912, and the following opinion then rendered thereon.

THE COURT.—A rehearing is asked on the ground that in the original opinion it was held: First, that the action was a collateral attack upon a judgment; second, that the judgment

in the action grants relief in excess of that prayed for; and, third, that the findings are not supported by the evidence.

Upon a re-examination of the matter we agree with the respondent that plaintiff was not precluded from attacking the assignment on the ground of fraud although the land had been distributed to defendant White in probate proceedings.

*Jenner* v. *Murphy,* 6 Cal. App. 434, [92 Pac. 405]; *More* v. *More,* 133 Cal. 489, [65 Pac. 1044], and other cases now for the first time called to our attention in the case, we think sustain plaintiff's contention. We therefore withdraw from the original opinion all discussion on that branch of the case. The second point or ground was not at any time given serious consideration and is unnecessary to the decision. The decision was rested entirely on our conclusion that the evidence is insufficient to support the findings and upon that point nothing in the petition for a rehearing creates, in our minds, a doubt of the correctness of our conclusions.

The petition is denied.

CHIPMAN, P. J.
BURNETT, J.
HART, J.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 27, 1912.