[S. F. No. 6046.    In Bank.—January 15, 1914.]

EARLE E. ROGERS, as Administrator of the Estate of James Taylor Rogers, Deceased, et al., Respondents, v. P. L. SCHLOTTERBACK et al., Appellants.

WILL—CONTRACT TO MAKE—PAROL EVIDENCE—SUFFICIENCY TO SUPPORT FINDINGS.—In this action to enforce an alleged contract in the nature of an agreement to make a will in favor of the plaintiff, the evidence supports a finding of such contract, resting in parol and made in 1851, whereby the sole surviving parent of the plaintiff surrendered the plaintiff, when a child, to the grantor, and ancestor of the defendants, upon the understanding that he and his wife would receive the plaintiff into their family and raise him as their child, and that "he should heir and share equally" with their own daughter.

ID.—INTERPRETATION OF CONTRACT—EXTENT OF PROMISEE'S RIGHTS.— The language of such agreement implies an undertaking on the part of the promisor and his wife that on their deaths they will divide their property equally between the plaintiff and their natural child, no other child having been born to them.

ID.—SPECIFIC PERFORMANCE—ORAL CONTRACT TO MAKE DEVISE.—Upon the death of the promisor such oral contract may be specifically ·enforced in favor of the promisee, who has performed his part thereof; the recent amendments to sections 1624 of the Civil Code and 1973 of the Code of Civil Procedure, adopted long after the contract was fully executed on the part of. the promisee and whatever rights he had thereunder were vested, having no application.

ID.—MANNER OF ENFORCING CONTRACT—DECREEING PROPERTY HELD IN TRUST.—Such a contract will be enforced not by ordering a will to be made, but by regarding the property in the hands of the heirs, devisees, ·assignees, or representatives of the deceased promisor, as impressed with a trust in favor of the plaintiff, and by compelling the defendants, who must of course belong to some one of these classes of persons, to make such a disposition of the property as · will carry out the intent of the agreement.    And where the promisor had, in violation of his agreement, conveyed his property to his only natural child and his granddaughter, the decree should direct them to convey to the plaintiff according to their respective rights, that is, both must share equally in the loss.

ID.—STATUTE OF LIMITATIONS—TIME OF ACCRUAL OF ACTION.—When the promisor conveyed part of his property to his daughter and granddaughter in violation of his agreement, the promisee's right of action in respect thereto did not accrue until the promisor died

without making the agreed disposition of his property, so that an action brought upon the death of the promisor is not barred by the statute of limitations, although the conveyance was made many years before.

ID.—PARTIES IN ACTION TO ENFORCE CONTRACT—JOINING ADMINISTRATOR AND HEIR.—If the promisee commences an action to set aside the conveyance, but dies before the case comes to trial, the action may be continued by his administrator, who is also his heir, in both his representative and individual capacity.

ID.—JUDGMENT—WHEN SHOULD RUN FOR PLAINTIFF IN REPRESENTATIVE CAPACITY.—A money judgment, recovered in such action, should run in favor of the plaintiff in his representative capacity as administrator.

ID.—DECREE OF DISTRIBUTION — CONCLUSIVENESS AGAINST PROMISEE UNDER CONTRACT TO MAKE DEVISE.—Where the promisor conveyed all his real property in his lifetime and at his death left an estate consisting solely of money, the decree of distribution in the matter of his estate is not conclusive upon the right of the promisee under the agreement of the promisor to make him heir.

ID.—CLAIM AGAINST ESTATE—WHETHER PROMISEE MUST PRESENT.— The promisee is not required, as a condition precedent to suing to set aside the conveyance, to present his claim against the estate of the deceased promisor.

ID.—ORAL CONTRACT TO MAKE WILL—DECLARATIONS TO PROVE.—In such action not only is it competent to show what was said by the parties at or about the time the agreement was entered into, but declarations confirming the agreement or statements as to its import by the promisor and his wife, who agreed to it, made during their lives, are admissible.

ID.—APPEAL—FAILURE TO ARGUE POINTS IN BRIEF.—Where alleged errors are not argued by an appellant in his brief, the appellate court is justified in disregarding them.

APPEAL from a judgment of the Superior Court of Sonoma County. Emmet Seawell, Judge.

The facts are stated in the opinion of the court.

T. J. Butts, A. B. Ware, and Phil Ware, for Appellants.

W. F. Cowan, for Respondents.

ANGELLOTTI, J.—This is an action brought against the grantees and distributees of William H. Rogers, deceased, and P. L. Schlotterback, the husband of one of said grantees and

distributees, to specifically enforce an alleged oral contract made by said William H. Rogers for the benefit of James Taylor Rogers, by subjecting certain property held by such grantees and distributees to the claims of said James Taylor Rogers under said contract. The action was commenced by said James Taylor Rogers, but he having died, his administrator and heirs have been substituted in his stead. Judgment went for the plaintiffs, and we have here an appeal from such judgment by defendants Sarah F. Carter and Eirmah E. Schlotterback, who are the grantees and distributees.

The learned trial judge, in deciding this case, filed a written opinion, which is contained in plaintiffs' brief. We quote therefrom statements as to the facts and his conclusions therefrom, which were embodied in the findings subsequently filed.

"This is a suit in equity. It is brought to enforce an alleged oral contract made in the state of Missouri in 1851 by Preston F. Logan on behalf of his infant son, Taylor Logan (afterward James Taylor Rogers), and William H. Rogers and wife. By the terms of said contract it is claimed that said William H. Rogers and wife promised and agreed to rear, educate, love and cherish said Taylor Logan, and upon death to make him an heir to share in their estate equally with their daughter, provided they could be given the entire and exclusive charge and custody of said infant. They were given said custody of the child, but it is claimed that William H. Rogers failed to perform the terms or do the things imposed upon him by said contract, to wit: to make said James Taylor Rogers as an heir to share in his estate equally with said daughter, or to make him an heir at all. Mrs. Rogers died in 1891. William H. Rogers died testate in this county in 1906. Some time prior to his death, in 1895, he made a deed of gift to Sarah F. Carter, his daughter, and Eirmah E. Schlotterback, his granddaughter, who is the daughter of Sarah E. Carter, of all the real property owned by him, reserving unto himself a life estate. The property so conveyed is farming land and consists of about 375.30 acres. It is known as the Rogers 'home' place.

"In 1901 said William H. Rogers made and executed a will, which has been admitted to probate in this court. By the terms of said will he bequeathed to Belle Jamison the sum

of $300; to James Taylor Rogers, whom he therein designates as his 'adopted son,' the sum of $5; all the rest and residue of said estate is given in equal shares to Sarah E. Carter and Eirmah E. Schlotterback, his daughter and granddaughter, respectively. The estate consists solely of personal property, and the amount left for distribution was $2,054.26. Mr. Rogers executed the will by making his mark. P. L. Schlotterback, husband of Eirmah E. Schlotterback, was made executor without bonds.

"Plaintiffs seek by this action to obtain a decree of this court decreeing that James Taylor Rogers, in pursuance of said agreement, is entitled to one-half of the lands passed by said deed of gift and that the same are held in trust by the defendants, in whose hands they still remain, for the use and benefit of plaintiffs and for general relief, etc.

"In 1836 Preston F. Logan and Nancy Cockrill intermarried in the state of Missouri. . . . To Preston F. Logan and wife were born four sons, Taylor being the youngest. The latter was born at Lexington, Mo., on August 7, 1848. Three months later, in November of the same year, his mother passed away, leaving the father with four sons. . . .

"William H. Rogers . . . was a Kentuckian by birth, and moved to Missouri in early days. He had made the acquaintance of the Hardin family in the state of his nativity. In 1841, in the state of Missouri, he married Irene F. Hardin, of whom the only living brother and sisters are Henry Andrew Hardin, Mrs. Sarah A. Hunt and Mrs. A. E. Cox, all of whom were witnesses in this case.

"In 1841 or 1842 there was born to the union of Mr. and Mrs. Rogers, Sarah Frances Rogers. The latter was five or six years older than Taylor Logan or James Taylor Rogers, as he afterward became known. Immediately upon the death of the latter's mother, the infant was placed in the custody of Mrs. Crisp, who lived with her family in the neighborhood of the Logan home. The child remained with the Crisp family for but a little while, as they were not in a position to care for it, and Mr. and Mrs. Rogers were exceedingly anxious to secure its custody. From the evidence it seems that the Crisps received compensation for keeping and caring for the infant. That Mr. and Mrs. Rogers much wished for the cus-

tody of the infant is undeniable. When the infant was but
a few months old William H. Rogers and wife succeeded in
their efforts to secure at least its temporary custody. Mr.
Rogers went to the Crisp house and himself carried it to his
home on a pillow. This incident is graphically related by
Mrs. A. E. Cox, Mrs. Rogers' sister, who lived nearby, and
was much of her time at the Rogers home. Sarah Frances
Carter, who is now the surviving widow of the late Joseph
Carter and the mother of Mrs. P. L. Schlotterback, was then
about six years of age. That Mr. and Mrs. William H.
Rogers shared the belief and had reason to believe that Sarah
Frances would be the only child of their bodies begotten is
shown by the statement, as will hereafter appear, made by
Mr. Rogers in declaring his purpose to adopt the infant, and
his belief in this respect is proven to have been well founded
by the fact that no other child was thereafter born. The love
of Mr. and Mrs. Rogers for the infant, which seemed strong
from the outset, seems to have grown day by day.

"In 1851, the child then being three years of age, Mr.
Preston F. Logan, his father, had concluded to join the great
army of fortune seekers moving westward, and to make his
home in California. It evidently was his intention to take
his child with him, or make some definite plan concerning it.
He visited the Rogers home and told Mr. and Mrs. Rogers
of his intentions. Both were much disturbed and distressed
at the thought of leaving the child whom they had come to
regard as a member of the household. Evidently Mr. Logan
offered to pay them for their services, but they protested that
they did not want the money, but wanted the child. On this
eventful day there were present Mr. and Mrs. Rogers, Mr.
Logan, long since dead, Miss Sarah F. Rogers, then eight
or nine years of age, and Mrs. A. E. Cox, who was then
about the age of eleven years. The story is told by the latter.
From the testimony of Mrs. Cox it must have been an affect-
ing scene and certainly made a lasting impression on her
mind. The Rogers offered to keep the child, rear and edu-
cate it as they would their own, if given to them. This
seemed not to be entirely satisfactory to Mr. Logan, according
to the testimony of Mrs. Cox. She states that Mr. Logan
replied to the offer substantially as follows: 'If you will take
the child in your family to heir and share equally with your

own daughter, I will give you my child.' To this Mr. and
Mrs. Rogers agreed. The child's custody was then forever
parted with by its father, who seemed deeply touched by the
transaction.

"There can be no doubt but that Mr. and Mrs. Rogers were
eager to take the child into their family. There is an abund-
ance of evidence to this effect from a number of sources. No
one can question this statement.

"It is first suggested, however, that the improbability of a
girl of eleven years remembering with any degree of accuracy
an agreement such as above stated, made 58 or 59 years ago, is
of itself sufficient to cause the statement to be received with
suspicion. If it were an ordinary transaction, yes, but one
such as the facts here disclose presents a different situation,
and much must depend on attending circumstances. Mrs.
Cox appears to be a trustworthy, intelligent woman, pos-
sessing mental vigor and powers of discrimination and ob-
servation above the ordinary. So far as the court is able to
discern, she has no selfish interest in the final result of this
action. So far as can be known, she speaks only that the
voice of truth may be heard as she believes she heard it.
There seems to be no reason why she should ever harbor a
wish except that only absolute justice be done, and that her
dead brother-in-law and sister's promise made to Preston F.
Logan, more than half a century ago, be redeemed. She was
not related to James Taylor Rogers, nor is she related to
any of his heirs. While Mrs. Cox was but eleven years of age
at the time that the custody of the child was surrendered to
Mr. and Mrs. Rogers, it was an extraordinary occasion and
one calculated to make more than a passing impression even
on the mind of a youth. She states that the Logan baby was
the only one in the neighborhood, and for that reason it at-
tracted more than ordinary attention. She practically made
the Rogers home her home. She was much attached to the
child, and entertained fears, as did Mr. and Mrs. Rogers, that
Mr. Logan would not consent to give up his child. She had
heard the matter debated, both in the Rogers home and in the
neighborhood. She describes the joy that prevailed in the
Rogers household and which was shared by herself when the
agreement was reached whereby the child was to remain in

and become a member of the Rogers household under the conditions above mentioned.

.     .     .     .     .     .     .     .

"The testimony of Mrs Cox, taken in its entirety, is certainly worthy of grave consideration. This much could be said of it, if it stood alone and was without corroboration. I cannot believe that she has painted a picture from fancy, because her picture of life is too real and vivid and comports well with the times and conditions that it is meant to portray. If the contract here sought to be established rested solely upon the testimony of Mrs. Cox, the situation possibly would assume a graver aspect. But eliminate, if you will, her narrative of the making of the contract and the testimony of Henry Andrew Hardin and Mrs. Sarah A. Hunt confronts you. Mr. Hardin accompanied Mr. Rogers across the plains in 1852. The Rogers family consisted of Mr. and Mrs. William H. Rogers, Sarah Frances Rogers, and James Taylor Rogers. Sarah Frances was about ten years of age and James Taylor three and one-half years of age. William H. Rogers, in common with many of his time, was deprived of early educational advantages, and consequently was uneducated. It was but natural, therefore, that his subjects of conversation should be limited and confined in a measure to those things that were most vital to himself. Mr. Hardin states that Mr. Rogers often, during the long journey across the plains, talked of James Taylor Rogers and his future. It was a subject of frequent conversation both then and afterward. On the journey he stated to Mr. Hardin that Mr. Logan did not want to give him the boy, but finally Logan said: 'I will give you the boy, if you will raise him and educate him and divide equally with your child.' Mr. Rogers further said in conversations that he had no boy and wanted his 'name to continue.' Mrs. Sarah A. Hunt testifies that both Mr. Rogers and her sister, Mrs. Rogers, told her that they had promised to educate the child, and it was 'to heir and fare as their child, and in that way they got the child.' She also testified that Mr. Rogers told her that Mr. Logan came to them and wanted them to keep (for compensation) the child. Mr. Rogers said to him: 'We don't want any money for the keeping of the child; all we want is for you to give us the child. It was to heir and fare as their child.'

"The above quotations taken from the testimony of Mrs. Cox, Mrs. Hunt, and Mr. Hardin, sisters and brother of Mrs. Rogers are only a few of many similar statements to be found in the testimony.

"All of the facts and circumstances tending to throw light upon the relation that William H. Rogers and wife sustained to James Taylor Rogers, independent of the declarations of both, tend strongly to establish the contract here contended for. That Mr. Rogers at the time of his receiving the child into his family, and continuously thereafter to the time of and subsequent to the death of his wife, which occurred in 1891, intended to make James Taylor Rogers his heir equal in amount to his daughter, is too manifest to require a detailed review of the testimony bearing on this issue. If no agreement was made whereby James Taylor Rogers was to share in the fortune of Mr. William H. Rogers, such a thought somehow crept into his mind at the time he received the infant into his family. This conclusion is unavoidable. The evidence overwhelmingly shows that such a thought was in his mind from the first. How did he come by it? Would it have been a strange thing for the father to have exacted as a condition of the surrender of his child that the foster-parent make it an heir equal in fortune with his own flesh and blood? The suggestion of heirship doubtless came to Mr. Rogers through Mr. Logan at their last meeting. The thought being in his mind, the most logical deduction is that the question of heirship was a part of the agreement insisted on by Mr. Logan, who, from all the evidence, loved his boy and was loath to part with him. This much seems true independent of the testimony of the three witnesses who testified to positive declaration made by Mr. Rogers. It was believed by some living in the neighborhood of Mr. Rogers in Missouri that he had adopted the child. It is not at all improbable that such an impression got abroad from frequent statements of the effect of the contract made by the parties thereto.

"All of the acts and declarations of Mr. and Mrs. Rogers concerning James Taylor Rogers, except during the latter years of Mr. Rogers's life, are in corroboration of the alleged contract. James Taylor Rogers's name was entered as a

record in the family Bible. No suggestion is there made that he is not a son.

"In January, 1866, William H. Rogers and wife procured the passage of an act of the legislature of this state changing the name of Preston Logan to Taylor Rogers. (See Stats., 1866, p. 18.) During all the years of his minority and for several years thereafter, James Taylor Rogers lived with the family of William H. Rogers. In fact, near neighbors were not aware that he was not the son of Mr. and Mrs. Rogers. If any preference were shown to one child over the other, it seems that he was favored over the daughter. He was called 'son' by Mr. and Mrs. Rogers, and he knew no other parents. He was a brother to Sarah Frances Rogers and their affection for each other was strong. The love that seemed to prevail in the Rogers household one for the other was exceptional. Such is the unbroken line of testimony from those who lived near and knew the family intimately for years, including relatives. James Taylor Rogers was obedient, respectful and industrious. The affection of parent for son and of son for parent was real. He worked faithfully on the farm, doing all sorts of farm work, when not actually attending school. He worked on the farm as did other boys in the community. . . . After finishing his academic course he took up the study of law and became a practicing attorney. He remained with Mr. and Mrs. Rogers during all the years of his minority, and for a time after he attained his majority. His relations with them were without a break during the whole of the lifetime of Mrs. Rogers, and continued pleasant up to the time that Mr. Schlotterback came into the family. Shortly thereafter Mr. William H. Rogers took up his residence with Mr. and Mrs. Schlotterback, with whom he continued to live until his death.

.    .    .    .    .    .    .    .

"In 1881 William H. Rogers made a will in which he divided his property in equal shares between his 'adopted son,' James Taylor Rogers, and his daughter, Sarah Frances Carter. In this will Henry Andrew Hardin is made trustee for the daughter. In the event of the death of the daughter without issue her share of the estate was to be given to James Taylor Rogers. His wife, Irene F. Rogers, was made executrix without bonds. This will was executed by mark and

C. H. E. Hardin and A. D. Laughlin were witnesses to its execution. The testimony shows that the will was made at the earnest solicitation of Mrs. Irene F. Rogers. She was then in poor health. Her anxiety for the future welfare of James Taylor Rogers was great. That James Taylor, by some fortuitous event, might not receive one-half of the estate weighed heavily upon her mind. Her anxiety in this respect falls but little short of the recognition of an obligation on her part. She afterward gave the will to Mrs. James Taylor Rogers. . . .

"Such facts and circumstances as above related and others of less moment, but still important to a consideration of the case, a consideration of which time will not permit, are strongly in support of plaintiffs' claims. The court entertains but little, if indeed any, doubt that the contract was made as contended for."

An examination of the record has satisfied us that it fully supports the foregoing statement of facts made by the learned trial judge, and it is clear that his conclusion that the contract was made as declared both in the opinion and the findings cannot be held to be without sufficient support in the evidence. There is no question whatever that the contract was fully executed on the part of James Taylor Rogers long before the execution of the deed of gift by William H. Rogers to Mrs. Carter and Mrs. Schlotterback.

We have, therefore, in this case, the sole surviving parent of a child entirely surrendering and giving up his child to others, upon the understanding and agreement on their part that they will receive him into their family and raise him as their child, and that "he should heir and share equally" with their own daughter.

Looking at the language used by the parties, in the light of all the circumstances, we are of the opinion that the meaning of the contract is clear enough. In so far as property was concerned, the boy was "to heir and share equally" with their own children, and on the assumption that they would have no other child of their own, he was to "heir and share equally" with their own daughter. He was to have what would be his share as a child under the laws of succession. The language fairly implies an undertaking that the property left by them at their death should go wholly to their children, including

this boy as a child, in equal shares. In the language of the trial court used in its findings of fact, their undertaking was that "on their deaths they would and should leave to and bestow upon him a share in and to their property equal to what their own child would be entitled to receive, and that on their deaths they would divide their property equally between the said Taylor Logan and their natural children, and that the said Taylor · Logan would receive a part thereof equal to what they should leave to the said Sarah Frances Rogers" (Mrs. Carter). Under the terms of this agreement, James Taylor Rogers was entitled to receive upon the death of Mr. and Mrs. Rogers, no other child having been born to them, one-half of all their remaining property.

That such an oral contract may be specifically enforced in favor of the promisee who has performed his part thereof, is thoroughly established in this state. We are speaking, of course, without reference to the recent amendments of sections 1624 of the Civil Code, and 1973 of the Code of Civil Procedure, relative to contracts of this character. Such amendments, adopted long after the alleged contract was fully executed on the part of James Taylor Rogers, and whatever rights he had thereunder were vested, constitute something more than a mere rule of evidence. As was held by the lower court, they can have no application to the case at bar. The doctrine of this court as to the enforcement of such contracts has been so fully and clearly stated and affirmed in such cases as *Owens* v. *McNally*, 113 Cal. 444, [33 L. R. A. 369, 45 Pac. 710], and *McCabe* v. *Healy*, 138 Cal. 81, [70 Pac. 1008], as to render extended discussion of the proposition unnecessary here. Suffice it to say if such a contract may fairly be said to be clearly and satisfactorily shown, if it is clear, certain, and definite in its terms; and if specific performance would not be harsh and oppressive and unjust to innocent third parties (see *Owens* v. *McNally*, 113 Cal. 444, [33 L. R. A. 369, 45 Pac. 710]), the contract, even when resting in parol, will be enforced, "not by ordering a will to be made, but by regarding the property in the hands of the heirs, devisees, assignees, or representatives of the deceased promisor, as impressed with a trust in favor of the plaintiff, and by compelling the defendant, who must of course belong to some one of these classes of persons, to make such a disposition of the property

as will carry out the intent of the agreement." (Pomeroy on Specific Performance, p. 268, quoted in *McCabe* v. *Healy,* 138 Cal. 81, [70 Pac. 1008].) See, also, *Baumann* v. *Kusian,* 164 Cal. 582, [44 L. R. A. (N. S.) 756, 129 Pac. 986].) We are of the opinion that there is nothing in this record warranting us in holding that plaintiffs are barred from relief by any such considerations as are suggested above. There is nothing in *Baumann* v. *Kusian* opposed to this view.

The trial court specifically enforced this contract by adjudging the heirs of James Taylor Rogers to be the owners of an undivided one-half interest in the lands conveyed by William H. Rogers to Mrs. Carter and Mrs. Schlotterback, decreed to hold the same in trust for them, and requiring them to convey the said undivided one-half to plaintiffs, and also giving plaintiffs judgment against Mrs. Carter and Mrs. Schlotterback for one-half of the amount received by them under the decree of distribution in the estate of William H. Rogers, deceased, and on account of rents and profits of said land after the death of William H. Rogers, less a certain amount deducted on account of advancements to James Taylor Rogers by William H. Rogers, the amount for which judgment was given being $684.48.

With reference to the land conveyed by William H. Rogers to Mrs. Carter and Mrs. Schlotterback, defendants earnestly urge that plaintiffs are barred from relief by various provisions of our statute of limitations. The objections in this behalf were presented both by demurrer and answer, and the trial court found against the defendants thereon. The district court of appeal of the third district likewise held that the action was not barred by any provision of the statute of limitations. It was principally due to a desire on the part of this court to give further consideration to this question, that the decision of the district court of appeal was vacated and the appeal ordered transferred to this court for determination.

As we have seen, the deed of gift of the land was executed and delivered by William H. Rogers to Mrs. Carter and Mrs. Schlotterback on December 7, 1895, and the same was immediately placed on record. This action was not commenced until after the making of the decree of final distribution in the matter of the estate of William H. Rogers, deceased, which

was made June 17, 1907. James Taylor Rogers had knowledge of the existence of this deed practically from the time it was placed on record. The consideration stated in the deed was "the love and affection" which the first party has for the second parties, "as also for the better maintenance, support, protection and livelihood" of said second parties. It contained a reservation of a life estate to the grantor for and during his natural life, "for him to take, use, enjoy, and dispose of all rents, issues, and profits of all of said lands and premises during his natural life and without any accounting, and at his death the said life estate shall immediately and wholly end and cease, and all of the above lands and premises stand then freed entirely from said life estate." The legal effect of this was, of course, to presently convey to the grantees therein named the whole of said lands, subject only to the life estate therein of the grantor. If the statute of limitations commenced to run against James Taylor Rogers as to this land at the time of the execution and delivery of the deed, or upon his acquiring knowledge thereof, his action was barred long prior to the death of William H. Rogers. The section of our Code of Civil Procedure chiefly relied on in this behalf is section 343, providing that "an action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued."

While the matter is not entirely free from doubt, we are of the opinion that the district court of appeal was correct in its conclusion that the action was not barred as to the land by any provision of our statute of limitations. So far as James Taylor Rogers was concerned, the contract was substantially that he should have what would be a child's share under the laws of succession, which, under the circumstances existing here, would be one-half. As suggested by the district court of appeal, the contract was not that he should receive or share in any specific property, but simply that he would be given the equivalent of one-half of all the property. There was nothing in the arrangement which could be construed as restricting William H. Rogers in his right to the free use, management, and disposition of his property during his lifetime, including his right to buy, sell, and otherwise control the same, provided he did not make such a disposition of it

as "would have been a fraud in law, or constructive fraud upon the agreement, whether he intended it as a fraud or not, or a disposition of it for the sole purpose of defrauding complainant, and depriving him of the benefit of his agreement, which would have been an actual and positive fraud." (See *Van Duyne* v. *Vreeland,* 12 N. J. Eq. 142, 153.) An absolute gift to others of so much of his property by William H. Rogers that the amount remaining at the time of his death would not satisfy the claim of James Taylor Rogers under the contract, if he survived William H. Rogers, especially where the gift was of such a nature as to warrant the conclusion that it was a part of the donor's plan for the disposition of his property upon his death, would appear to be a "fraud in law, or constructive fraud upon the agreement," whether intended as a fraud or not. Whether the gift in this case to Mrs. Carter and Mrs. Schlotterback would have the effect of depriving James Taylor Rogers of any property to which he might be entitled under the contract was a question that could not be determined until the death of William H. Rogers. What James Taylor Rogers was entitled to, in the event that he survived William H. Rogers, was one-half of all the property that William H. Rogers might leave. In view of the construction given by the trial court to the agreement, which we consider warranted, we are of the opinion that in determining what property was so left, the court properly included the land given to Mrs. Carter and Mrs. Schlotterback by the deed of gift. But James Taylor Rogers had no enforceable right under his contract in regard to such land or any other property prior to the death of William H. Rogers. Whatever rights he had under the contract, in so far as "heiring and sharing" in the property are concerned, accrued only on the death of William H. Rogers, and only in regard to such property as may properly be held to come within the scope of the contract, i. e., property left by William H. Rogers. He had no right of action of any character against William H. Rogers and his grantees at any time during the life of said Rogers, except that possibly he might have maintained an action in equity to obtain a decree protecting him against future possible injury to his rights, as was done in *Van Duyne* v. *Vreeland,* 12 N. J. Eq. 142, 153, where the chancellor said that "if this court does not inter-

fere now for the protection of the complainant, and secure this property at the death of Vreeland, it may have passed into the hands of a *bona fide* purchaser, and the complainant then be remediless.'' The case just referred to was, however, one where the conveyance was clearly and unmistakably in violation of the agreement, as the plaintiff was entitled thereunder to *all* the property that the deceased might leave. But the sole object of any such action is to protect the complainant against the intervening rights of third parties, the obtaining of precautionary relief. The failure to bring such an action and obtain such relief could in no way prejudice the rights of James Taylor Rogers where, as here, there are no intervening rights of third parties. His right to maintain any action to enforce the contract accrued only upon the death of William H. Rogers. And we think, in line with what was said in *Johnson* v. *Hubbell,* 10 N. J. Eq. 332, [66 Am. Dec. 773], that under such circumstances as appear in regard to the conveyance to Mrs. Carter and Mrs. Schlotterback, which warrant a conclusion that the gift was in the nature of a testamentary disposition, ''in order to protect the agreement or obligation, . . . courts of equity will treat this gift in the same manner as if it were purely testamentary, and were included in the will,'' with the result that ''the subject matter of the gift will be brought back and made the fund out of which to perform the obligation.'' We are speaking, of course, only of a case where there is no intervening right of any third party who has taken in good faith.

As to certain other points made by the defendants we concur in what was said by the district court of appeal, as follows:

''A misjoinder of parties is claimed in making Earle E. Rogers a party both as administrator and in his individual capacity. *Dias* v. *Phillips,* 59 Cal. 293, and some other cases are cited by appellants. The report in the Dias case does not disclose the nature of the action. Plaintiff brought the suit in his individual right and also in his representative capacity, as executor. The court held that the right of action was in him or in the estate, and not in both. The judgment was that *plaintiffs* J. L. Dias and J. L. Dias, as executor, etc., do recover. In *Janes* v. *Throckmorton,* 57 Cal. 368, the action was to establish a trust and to compel the defendant to

convey the *legal title to real estate* to the plaintiffs as heirs at law of Janes. Defendant claimed that the administrator of the estate of Janes alone could bring the action. The court held that the action was properly brought under our statutes for the reason that the administrator is not entitled to have the *title* to the property conveyed to him. The case here is to have the title declared to be in the heirs, the delivery of possession to the parties entitled thereto, and that an accounting of rents, issues, and profits be ordered. It is true that in their *prayer* the plaintiffs ask 'that said defendants be required to convey a one-half interest in and to said lands to the plaintiffs, and to pay to said plaintiffs one-half of all the moneys so retained by them.' But the facts alleged in the complaint show the respective rights of the heirs and jugdment of the court in respect of the land was that the heirs, naming them, are the owners of said land—the widow one-third and each of the children two-ninths, 'and the said Earle E. Rogers, as the administrator of James Taylor Rogers, deceased, is entitled to the possession of said . . . lands for the purposes of administration and distribution of the estate of said James Taylor Rogers, deceased.' The judgment in favor of plaintiffs for the money found to be due should provide likewise that it be paid to the administrator for purposes of administration, but the judgment may be modified in that regard.

"Section 385 of the Code of Civil Procedure provides that, in case of the death of a party, 'the court, on motion, may allow the action or proceeding to be continued by or against the representative or successor in interest'; and section 1452 of the same code provides that 'The heirs or devisees may themselves, or jointly with the executor or administrator, maintain an action for the possession of the real estate, or for the purpose of quieting title to the same, against any one except the executor or administrator; but this section shall not be so construed as requiring them to do so.' Strictly speaking, the action here may not be to quiet title, but it has that effect. The administrator is entitled to possession of property of the estate pending administration and part of the relief sought to obtain possession. He is, to a limited extent, an interested party. We see no reason why he may not

be joined as plaintiff and certainly no one is prejudiced thereby:

"It is claimed that the cause of action is barred by sections 1666 and 1667 of the Code of Civil Procedure.

"These sections relate to the conclusiveness of the decree of distribution 'as to the rights of heirs, legatees, or devisees.' W. H. Rogers had conveyed all his land in his lifetime to defendants, Mrs. Carter and Mrs. Schlotterback. The estate distributed consisted entirely of money. Creditors, or persons other than the class referred to in the statute, having equitable claims against the heirs, legatees or devisees, are not concluded by the decree of distribution. (*Estate of Cooks,* 125 Cal. 459, [58 Pac. 89]; *Barnard* v. *Wilson,* 74 Cal. 512, [16 Pac. 307]; *More* v. *More,* 133 Cal. 489, [65 Pac. 1044]; *Jenner* v. *Murphy,* 6 Cal. App. 434, [92 Pac. 405]; *Hopkins* v. *White,* [on rehearing], 20 Cal. App. 234, [128 Pac. 780].) Plaintiffs are not claiming under the will of W. H. Rogers by virtue of the heirship of James Taylor Rogers; they are claiming under the contract of their ancestor with him and in hostility to the will and distribution under it and the deed made by W. H. Rogers.

"The principle underlying this class of cases is very well and quite fully discussed in the somewhat similar case of *Winne* v. *Winne,* 166 N. Y. 263, [82 Am. St. Rep. 647, 59 N. E. 832].

"The point made by the demurrer that several causes of action are improperly joined is not argued in the defendants' brief, and is, we think, without merit.

"Much attention is given in defendants' brief to the evidence relating to the averments of fraud, of the confidential relation of defendants with William H. Rogers, of his weakened condition of body and of the undue influence exercised by defendants in bringing about the execution to defendants of the deed and the will in their favor, cutting off Taylor Rogers with the nominal sum of five dollars. It is contended that the evidence upon these matters does not support the findings. We deem it unnecessary, for reasons already given, to enter upon a discussion of these features of the case. The motive of defendants' testator, his physical or mental condition, the immediate influence, undue or otherwise, the then relation of defendants with him, confidential or not, have

no bearing upon the real issue involved,—namely, Did he make the contract, the subject of the action, and did Taylor Rogers perform the part devolved upon him? The evidence was sufficient to show that the contract substantially as pleaded, was entered into by William H. Rogers with the father of Taylor Rogers and was fully performed by the latter. The findings upon immaterial issues may be disregarded.

"The point is made by defendants that the deed could not be set aside until plaintiffs had first established their claim and the amount due under the contract had been ascertained or they had presented their claim to the executor of William H. Rogers's estate and had it allowed. (Citing section 1493 of the Code of Civil Procedure, which prescribes the time within which claims must be presented against the estate of a deceased person.)

"*Lathrop* v. *Brompton,* 31 Cal. 24, [89 Am. Dec. 141], 'holds that equity will enforce a trust against the personal representatives of a deceased trustee, and without presentation of a claim against the estate, when the identical trust property and its product in a new form can be traced into the estate and so into the possession of the representatives.'

"The property involved in the present case was impressed with a trust, and, as it consisted of all the property of which the trustee died seized or which he had disposed of in violation of his trust, there is no difficulty in identifying it and having an accounting in respect of it. Clearly, it is not such a claim as may be heard and determined by the court sitting in probate, for only in an action in equity can the matter be fully inquired into. The action now pending will be determinative of it and we do not think the claim is one requiring presentation for allowance before the action would lie either as a contingent claim or otherwise. This question was raised in *Furman* v. *Craine,* 18 Cal. App. 42, [121 Pac. 1007], and decided adversely to defendants. That case is also instructive upon the principal point involved in the present case.

"Numerous errors of law (over fifty) are assigned and attention called to them in defendants' brief. This is done in most instances by merely quoting the question and citing the folio of the transcript. Where no argument follows or reasons are given for asking the question or for error in refusing

to allow it or in allowing it to be answered, we are justified in disregarding the alleged error. (*Madeira* v. *Sonoma Magnesite Co.*, 20 Cal. App. 719, [130 Pac. 175]; *Pigeon* v. *Fuller*, 156 Cal. 691, 702, [105 Pac. 976].) Such as seem to invite attention will be noticed.

"Questions were allowed, over objection, which called for testimony as to what was said by the parties to the alleged contract at the time it was entered into and as to testimony of statements made by William H. Rogers and his wife at different periods of their lives concerning the terms upon which Taylor Rogers was admitted into their family. We have seen that such contracts, whether oral or in writing, may be enforced, and, if oral, they must of necessity be proven by word of mouth. Not only was it competent to show what was said by the parties at or about the time the agreement was entered into, but declarations confirming the agreement or statements as to its import by William H. Rogers of his wife, who agreed to it, made during their lives, were admissible.

"The will made by W. H. Rogers in 1881, and what was said about it by him and his wife, in which he made provision for Taylor Rogers, were admissible as corroborative of the evidence concerning the making of the agreement and as tending to show his purpose was to carry out the agreement.

"It was immaterial when plaintiff, R. R. Rogers, son of Taylor Rogers, first learned of the making and recording of the deed in question. The knowledge of the son would not affect his rights, and, as the deed was a gift deed, the knowledge of Taylor Rogers as to when it was made would, as we have seen, be also immaterial.

"There was evidence that plaintiffs' intestate was, in his lifetime, executor of the will of J. W. Carter, deceased, formerly the husband of Taylor Rogers's foster-sister. Defendants' witness, Belle Jamison, was asked whether she had ever heard W. H. Rogers say anything regarding the settlement of the Carter estate; or about his being on Taylor Rogers bond; or whether she heard him say 'I intend to make it good out of the money that I intended for Taylor'; also, that 'Taylor had taken more off the children than he was entitled to, and he intended to make it up out of what he intended to give Taylor,' and that if 'he had known that James Taylor

Rogers was going to act that way he would never have picked him up.' Objection to these questions was sustained. The following question was also objected to and objection sustained: 'Q. Did Mr. Rogers, while reading the San Francisco papers, say to you or not say to you, "Belle, you ought just to read this about him robbing the estate of the dead? He is no longer any son of mine." Q. Did he ever say to you, during the time you resided on 4th Street, that from that time he disowned James Taylor Rogers?'

"There was introduced the decree settling the account of Taylor Rogers and his coexecutor, Hardin, of the Carter estate. This decree shows that executor Rogers had made an excessive charge for commissions which the court disallowed. There was no offer to show that Rogers had corruptly made this claim or that he made the charge knowing that it was, as was found by the court, 'without authority.' There is no evidence and it was not offered to prove that W. H. Rogers, as bondsman of Taylor Rogers, was ever called upon to 'make good' this overcharge, or that the amount was lost to the estate. Nor is there any evidence or offer to prove any fact concerning Taylor Rogers's connection with this Carter estate which reflects upon his character, either individually or as an attorney, or that would have justified W. H. Rogers in declaring, 'He is no longer any son of mine,' except this overcharge for commissions.

"There was offered in evidence and excluded an article purporting to have been published in the San Francisco *Call* of July 17, 1900, in which Taylor Rogers's name is connected with matters seriously reflecting upon his moral character and his reputation as an attorney. No offer was made to show that the charges there made had any foundation of truth. Nor does it certainly appear that W. H. Rogers had referred to this article when he declared 'Taylor Rogers is no longer son of mine,' although such inference might possibly have been drawn from his remark to witness Belle Jamison which the court held to be immaterial. The only San Francisco papers he is shown to have read were the *Chronicle* and *Examiner*. These matters occurred about 1899. Taylor Rogers was then over fifty years of age, was married and had a family of several children. To his wife and some of his children W. H. Rogers had made known his relationship

to their husband and father. Whether the real cause of his changed mental attitude toward the man he was proud to call his son for so many years can be traced, as is claimed by plaintiffs, to the sinister influence of defendants, or to the matters relating to the Carter estate, need not be affirmed or denied. If it be conceded that circumstances might arise under which a court of equity would, in favor of heirs of the blood, feel itself justified in refusing specific performance of a contract such as we have here, we do not think a showing has been made or offered to be made such as would warrant our holding that the learned trial judge erred, either in his rulings or in his findings, upon material issues in the case.''

The lower court did not err in adjudging that both Mrs. Carter and Mrs. Schlotterback held an undivided one-half interest in the realty in trust for the use and benefit of plaintiffs, and directing them to convey the same to plaintiffs according to their respective rights. In view of what we have said, plaintiffs as successors of James Taylor Rogers, are entitled to a full undivided one-half of this property. The decree should not be so limited as to apply only to the undivided one-half interest standing in the name of Mrs. Schlotterback. The courts have no right to hold that the latter shall be wholly deprived of the interest attempted to be conveyed to her by W. H. Rogers in order that Mrs. Carter shall have a full undivided one-half of the property of deceased. So far as both Mrs. Carter and Mrs. Schlotterback were concerned, William H. Rogers could legally dispose of the property that was not subject to the contract rights of James Taylor Rogers, as he saw fit. No contract right appears on the part of either Mrs. Carter or Mrs. Schlotterback. There is nothing to warrant a conclusion that it was the interest of James Taylor Rogers that he attempted to give to Mrs. Schlotterback, and that consequently she alone must satisfy the claim of the successors of James Taylor Rogers. The practical result of the judgment of the lower court is that Mrs. Carter and Mrs. Schlotterback share equally in such property as is left after satisfying the claim of the successors of James Taylor Rogers, and we are satisfied that the judgment was, in this respect, correct.

As to the money, it was said in the opinion of the district court of appeal:

"The decree adjudged that 'plaintiffs do have and recover judgment against the said defendants, Eirmah E. Schlotterback and Mrs. Sarah F. Carter, for the sum of $684.48 and the same is hereby declared to be a lien upon all the right, title and interest of the said defendants (Mrs. Carter and Mrs. Schlotterback) in and to the remaining undivided one-half interest of, in and to the said lands and the said lands are hereby impressed with said lien in the amount above mentioned.'

"This part of the judgment is based upon the following facts: In the distribution of the residue of the W. H. Rogers estate, which estate consisted of money only, the court found the sum to be $2,054.26. Of this sum, after deducting two legacies amounting to $305, Mrs. Rogers and Mrs. Schlotterback each received $874.63. The court found that

| | |
|---|---|
| the rents, issues and profits of the land, after the death of W. H. Rogers, amounted to | $2,803.46 |
| Expenses, taxes, etc. | 1,183.75 |
| Leaving a balance of which each received of the rents, issues, and profits of | $809.85 |
| To this the court added the amount distributed to each of said defendants | $876.60 |
| Making a total to each of | $1,694.48 |

From this the court deducted one thousand dollars advanced to Taylor Rogers in his lifetime, leaving the amount $684.48, as shown above, and ten dollars in excess of the amount found by the court."

In view of what we have said, this portion of the decree was also correct, with the exception, as stated by the district court of appeal, that the judgment for money "should run in favor of the plaintiff, Earle E. Rogers, in his representative capacity as administrator of the estate of James Taylor Rogers, deceased, for the purpose of administration (*Miller v. Ash*, 156 Cal. 544, 556, [105 Pac. 600]; *Robertson v. Burrell*, 110 Cal. 568, 574, [42 Pac. 1086])," instead of in favor of the "plaintiffs." The judgment will be modified in this respect.

There is no other matter requiring notice here.

It is ordered that the judgment appealed from be and the same is hereby modified in the respect just stated, and as so modified said judgment is affirmed. It is further ordered that plaintiffs recover their costs on this appeal.

Sloss, J., Lorigan, J., Melvin, J., and Henshaw, J., concurred.

SHAW, J., dissenting.—I dissent. I am of the opinion that, so far as the land conveyed to Mrs. Carter and Mrs. Schlotterback is concerned, the action is barred by the statute of limitations and by laches.

It appears that the deed to them was recorded on December 7, 1895, and that James Taylor Rogers was very soon afterward apprised of its contents. His right, if any, was one arising upon the contract made in 1851. It then became and ever since has been a vested right, and, consequently, a right which was under the protection of the courts in case it was violated or endangered. The conclusion that the action is not barred is predicated upon the proposition that no cause of action accrued in his favor until the death of William H. Rogers, on December 26, 1906, except, perhaps, an action to obtain a decree protecting him against a future conveyance by the grantees to an innocent purchaser for value. *Van Duyne* v. *Vreeland,* 12 N. J. E. 142, is cited as authority for this possible action.

I am by no means certain that even the accrual of an action of that character would not be sufficient to uphold the doctrine that the present action is barred. But the decision cited goes much further than that. It holds that a deed such as that executed to Mrs. Carter and Mrs. Schlotterback, if executed, as is here claimed, for the purpose of preventing an equal share in the estate from going to James Taylor Rogers upon the death of William H. Rogers, would be an actual and positive fraud, "a fraud upon the agreement" anciently made, and that it gives the claimant under such agreement an immediate right of action to obtain a decree declaring that such deed is "a fraud upon the agreement," and adjudging that the grantee shall "hold the land subject to that agreement," and that, upon the death of the grantor, such grantee shall convey to the claimant the share to which

he would be entitled under the agreement. This would be, in substance, a decree that, instead of the absolute estate in remainder which the grantee would take by the terms of the deed, he should hold his interest in the land in trust for the benefit of such claimant, to the extent of the claimant's prospective interests, and practically annulling the deed as a conveyance of the absolute estate in remainder. Such an action could have been maintained by James Taylor Rogers, immediately after the execution of the deed in 1895. It would have been an action for relief on the ground of fraud, and it would have been barred in three years from the time the fraud was discovered or from the time when, by due inquiry, it might have been discovered. (Code Civ. Proc., sec. 338.) Such an action was a remedy fully adequate to secure to him substantially the same relief as he seeks by the present action. It would have been based on the same facts, and, if he had succeeded, it would have established those facts, as well as his rights under them. The present action should therefore be held to be barred on the same principle as that upon which it is held in equity that a suit is barred if it is based on the same facts and rights as would be necessary to sustain an action at law which is barred, although the relief sought in equity is not precisely the same as that which might be obtained at law. (*Elmendorf* v. *Taylor,* 10 Wheat. (23 U. S.) 152, [6 L. Ed. 289]; *People* v. *Everest,* 4 Hill (N. Y.) 71; *Reeves* v. *Dougherty,* 5 Yerg. (Tenn.) 222, [27 Am. Dec. 496]; *Hambert* v. *Trinity Church,* 24 Wend. (N. Y.) 593; Wood on Limitations, sec. 58 and notes.) The making of this deed was a clear repudiation by the grantor of the obligation of the agreement of 1851 and of any trust created thereby in the property conveyed, as well as of all claim of James Taylor Rogers to take an interest therein at the grantor's death. The latter's knowledge of the deed put him on inquiry as to its alleged fraudulent purpose and charged him with notice thereof. His neglect to begin any action concerning his claim during the ensuing eleven years of the life of the grantor, and until after the grantor's death had deprived the grantees of the grantor's testimony on the subject of the ancient agreement, and it should, upon familiar principles of equity jurisprudence, be sufficient to characterize the present action as a stale demand barred by his laches in failing to pursue the remedy at all times open to him.