[Civ. No. 36967. Second Dist., Div. Five. Sept. 7, 1971.]

JEAN CAMERON, Plaintiff and Appellant, v.
CROCKER-CITIZENS NATIONAL BANK et al.,
Defendants and Respondents.

## COUNSEL

Ryan & Traxler, G. Bentley Ryan, Salyer & Bucknum and John C. Salyer for Plaintiff and Appellant.

Gibson, Dunn & Crutcher and Richard H. Wolford for Defendants and Respondents.

## OPINION

**KAUS, P. J.**—Plaintiff appeals from a judgment to the effect that she did not have an equitable interest in the estate of her former husband, Arthur Cameron.

### FACTS

After a brief marriage, which followed a long courtship, plaintiff and Cameron were divorced in 1961. Although the property settlement agreement limited alimony payments to $1,000 per month for five years, Cameron generously supplemented these payments during the following years. Plaintiff moved to Paris where she became engaged to a French diplomat.[1] In 1964 she returned to live at the Beverly Hills home which Cameron had once given her as a present. She remained there until Cameron's death in 1967. Plaintiff testified that her return to Beverly Hills was caused by Cameron's oral promise that he would provide for her while alive and leave her a "child's portion" of his Los Angeles County property.[2] The

---

[1] The engagement had a cosmetic defect in that plaintiff's fiance was Catholic, married and had two children.

[2] The record does not reveal the exact value of the share in Cameron's estate on which plaintiff sought to impose the constructive trust. It is quite evident, however, that it was worth fighting for.

exact nature of the services plaintiff was to perform for Cameron after taking up residence in Beverly Hills is not certain. It is nevertheless evident that, under plaintiff's interpretation of her obligations, she was to be at Cameron's beck and call.[3]

It is not questioned that between 1964 and 1967 Cameron expended over $90,000 on plaintiff. On the other hand if he ever included her in a will, the document was never found, at least not by plaintiff.

There was some corroboration of plaintiff's testimony and much impressive contradictory evidence. After a lengthy trial the court concluded: ". . . that the plaintiff has not by clear and convincing evidence proved the existence of an oral contract on [the] part of decedent to provide for plaintiff by will as alleged. . . ." The judgment appealed from followed in due course. A motion for a new trial was denied.

## CONTENTIONS

Plaintiff's contentions are: 1. that the trial court erred when it weighed the evidence in the apparent belief that it was plaintiff's burden to prove Cameron's promise by clear and convincing evidence, rather than by a mere preponderance; 2. that the trial court erred in excluding certain evidence by the witness Julie Reding; and 3. that the trial court erred in failing to grant a new trial on the basis of newly discovered evidence.

## DISCUSSION

None of plaintiff's points has merit.

*Burden of Proof*: The rule that oral contracts to make a will must be proved by clear and convincing evidence is deeply rooted in California case law. It is hardly surprising that most—if not all—cases announce it by dictum. The actions, being equitable in nature, do not call for jury instructions and rarely does it appear—as in the case at bar—which burden of proof the court applied before announcing its finding.

Much to the surprise of the Supreme Court itself, the first California case involving a contract to make a will was *Owens* v. *McNally,* 113 Cal. 444 [45 P. 710]. Citing cases from other jurisdictions the court, as it were, laid down the ground rules for future litigation of this type. In speaking of English precedents the court summarized them as permitting the enforcement of oral contracts to make a will "upon clear proof" of their execution. It

---

[3]One of the many factual issues which divided the parties below was just how much becking and calling Cameron did after plaintiff returned. It is certain, however, that there were several other individuals who, whether freely or under some kind of obligation, were more or less at Cameron's constant disposal.

also approved the statement in an American case that in enforcing such contracts "the court would be more strict in examining into the nature and circumstances of such agreements than any others. . . ." (*Owens* v. *McNally, supra,* 113 Cal. at pp. 448-449.)

Eighteen years later in *Rogers* v. *Schlotterback,* 167 Cal. 35, 45 [138 P. 728], the court described the relevant burden of proof as "clear" and "satisfactory." The language in both cases was quoted with approval in *Monsen* v. *Monsen,* 174 Cal. 97, 98-99 [162 P. 90]. The rule requiring proof by more than a mere preponderance of the evidence was, therefore, not something which the Supreme Court inadvertently slipped into the law by way of dictum in *Notten* v. *Mensing,* 3 Cal.2d 469, 477 [45 P.2d 198]. As plaintiff recognizes the rule has been restated many times since and must be considered good law.

Plaintiff's attempt to distinguish this case, which she calls a "service" case, from other cases which involve mutual wills or consideration to the decedent flowing from someone other than the plaintiff, is not convincing. The reason for the increased burden of proof was stated in *Monsen* to be ". . . the manifest danger of fraud, perjury, and injustice that may inhere in a recognition of the right to alter, by parol testimony, the course of disposition of the property of a decedent. . . ." (*Monsen* v. *Monsen, supra,* 174 Cal. at p. 98.) The dangers adverted to in *Monsen* are just as much present where the plaintiff has rendered the consideration for the alleged promise.

Plaintiff also suggests that in some strange fashion *Brewer* v. *Simpson,* 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289], has overruled the *"Notten* dictum." The sole basis for the argument is that there a judgment for the plaintiff was affirmed without the court saying anything about the burden of proof. Indeed plaintiff refers us to several other cases where nothing on the subject was mentioned. ■ We find it difficult to follow that argument, for unless some question concerning the burden of proof is raised at the trial and the court announces the burden which it applies, the matter is quite academic on appeal. The appellate court must affirm if there is any substantial evidence to support the judgment and must assume that the trial court viewed it with the correct burden of proof in mind.[4]

■ *Exclusion of Evidence:* The error, if any, in excluding certain testi-

---

[4]"The decisions have shown that if the rule is disregarded by the trial judge it becomes a nullity. For the nature of the appellate review is the same as in other cases; i.e., the question whether the evidence of the plaintiff is clear and convincing is for the judge, and *his determination on conflicting evidence* will not be disturbed on appeal." (Witkin, Cal. Evidence (2d ed. 1966), § 209, p. 190.)

mony of Julie Reding has been blown up out of all proportion to the importance of the allegedly erroneously excluded evidence.

Before the point in the proceedings to which plaintiff directs our attention, Julie had given testimony tending to support the existence of the alleged promise by Cameron. Thus she testified to a conversation with Cameron in which he told her certain real property in Los Angeles County "would one day go to his children and Jean." He made similar statements on at least two other occasions. Once he said that "Jean . . . has her tail in the sugar bowl."[5]

In the fall of 1966 Cameron was sick and receiving treatment at the Mayo Clinic. Julie accompanied him to Rochester. Melissa, Cameron's daughter, was summoned from the East where she lived. Julie was present at a conversation between Melissa and Cameron during which Melissa supposedly said to Cameron: "You know, Dad, you should make provisions for Cozy, Ernie and Jean."[6] Without objection Julie testified that Cameron replied: "Now, you know that I have taken care of Jean." Melissa: "Well, are Ernie and Cozy taken care of?" Cameron: "No, they're not." Melissa: "Don't you think you should go and have them put in your will?" Cameron: "Yes, I should." A few pages of transcript later, plaintiff's counsel made several attempts to have Julie amplify her testimony so as to indicate her understanding of Cameron's statement that Jean was taken care of, as meaning that he had taken care of her in a will.[7] At one point counsel asked Julie whether she was aware "of the fact that Mr. Cameron had made provision for Jean in his will." An objection that the question assumed a fact not in evidence was properly sustained. Counsel then, addressing the court, said that what he meant was whether Julie was aware that Cameron had told her that he had made provision for Jean in his will. Turning to Jean he asked her: "Were you aware of that?" An affirmative

---

[5] Later the witness added that Cameron specifically said that Jean would receive "a child's portion" in certain real properties. That, of course, was the exact language in which Cameron supposedly made his promise to Jean. Much evidence was received on whether or not Cameron ever used that particular figure of speech.

[6] Cozy and Ernie were household employees.

[7] The probative value of all this is open to serious doubt. The premise is, perhaps, that if Cameron had "taken care" of plaintiff in a will, he had done so pursuant to the oral promise plaintiff was trying to enforce. This seems farfetched since, on plaintiff's own evidence, her relationship with Cameron was such that she had every right to expect to be remembered, promise or no promise. Perhaps the intended inference is merely that, whether or not he had actually done so, Cameron's statement that he had provided for plaintiff in his will, indicates a sense of obligation to do so. This seems even more farfetched. It should be noted that there is no evidence in the record that as of the time of this conversation Melissa knew anything about the alleged promise, so that it cannot be inferred that she was reminding her father of a legal obligation.

answer was stricken. In addition to assuming the same fact which was not in evidence, the question was obviously leading and the ruling was correct. Counsel then established that the subject matter of the conversation was, indeed, Cameron's will. This was followed by another leading question whether Cameron had stated that he had taken care of Jean in his will. Again an affirmative answer was properly stricken. During an ensuing argument the trial court declared that it had no doubt that the subject matter of the conversation was Cameron's will. After one more leading question, the subject matter was dropped.

It seems perfectly obvious to us that the trial court's rulings were entirely correct. The witness had been permitted to testify fully to all facts within her knowledge. The argument on appeal is that unless it was clearly understood that Cameron was talking about taking care of Jean in his will, his statement could be interpreted to mean that he was not about to leave her anything, since he had been generous enough in his lifetime. That, of course, is a permissible interpretation of Cameron's statement, but we just do not see how Julie's bold conclusion that that is not what Cameron meant, could have aided the trial court.[8] (*People* v. *Arguello*, 244 Cal.App.2d 413, 419-421 [53 Cal.Rptr. 245].) Of course a lay person may, in a proper case, testify in the form of an opinion if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of his testimony." (Evid. Code, § 800.) It does not appear, however, that there was anything in the situation which had not already been brought to the attention of the trial court, which was in just as good a position as Julie to decide what Cameron had meant.

In any event in the light of Julie's testimony concerning the three conversations with Cameron in which he had told her about Jean's expectancy, the whole issue is a storm in a teacup.

While Julie was testifying, the trial court sustained an objection to an offer of proof. The offer was that after the conversation with Cameron, Julie said to Melissa: "Melissa, that was so nice of you to speak up for Jean about your father's will." Melissa allegedly replied: "I meant it. I mean it for Jean. She deserves it. She really loves Dad."

Much later during the trial Melissa testified and denied that Cameron had ever stated that Jean was taken care of in his will. At that point the court expressed a doubt concerning its ruling excluding the offer of proof. It was then stipulated that if Julie were recalled as a witness she would testify in accordance with the offer.

---

[8]Actually she was never asked for her conclusion. Plaintiff's posture on appeal must be that in view of the court's other rulings, it would have been useless to do so.

Plaintiff claims that the stipulation was only to the effect that Julie be deemed to have testified in accordance with the offer for the sole purpose of impeaching Melissa. While it is true that the impeaching effect of Julie's proposed testimony appears to have been the trigger which caused the court to reconsider its ruling, the record is clear that the testimony was deemed to have been given for all purposes.

■ *Denial of Motion for New Trial*: To support her motion for a new trial plaintiff produced a declaration by Julie to the effect that she now recalled and had recalled at the trial that during the Mayo Clinic conversation Cameron had expressly said that he had taken care of Jean in his will. She further declared that she thought she had so testified and only after reading the record realized that she had not. She claimed to have become confused by counsel's objections, motions to strike and arguments. Plaintiff's counsel filed his own declaration in which he valiantly tried to convince the court that the contents of Julie's declaration were "[n]ewly discovered evidence . . . which he could not, with reasonable diligence, have discovered and produced at the trial." (Code Civ. Proc., § 657, subd. 4.)

There are so many reasons why the trial court did not err in failing to grant a new trial on the basis of the showing made, that we will not take the time to list them all. We merely point out that the trial court could disbelieve Julie's declaration in its entirety. The first time she testified concerning Cameron's statement there were no objections, motions to strike or arguments. Nevertheless she did not then state that Cameron had expressly mentioned his will. Further, in the light of Julie's testimony concerning the three conversations with Cameron which preceded the Mayo Clinic remark, the evidence was clearly cumulative. Finally, it is well within the trial court's discretion to determine that the evidence, even if admitted, was not likely to produce a different result. (*Schultz* v. *Mathias,* 3 Cal.App. 3d 904, 910 [83 Cal.Rptr. 888].)

The judgment is affirmed.

Aiso, J., and Reppy, J., concurred.

A petition for a rehearing was denied September 24, 1971, and appellant's petition for a hearing by the Supreme Court was denied November 24, 1971.